IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| QUADVEST, L.P. AND WOODLAND OAKS UTILITY, L.P. | § § § | |
| Plaintiffs, | § § | |
| VS. | § § | NO. 19-CV-4508 |
| SAN JACINTO RIVER AUTHORITY, | § § | |
| Defendant. | § § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

Plaintiffs, QUADVEST, L.P. and WOODLAND OAKS UTILITY, L.P. file this antitrust Complaint against the Defendant, SAN JACINTO RIVER AUTHORITY, and respectfully show the Court as follows:

## I.
## INTRODUCTION AND SUMMARY OF COMPLAINT

1.     This is a Complaint for injunctive relief to enjoin Defendant from injuring Plaintiffs through the continued operation of a monopoly and a price fixing scheme that violate the Sherman Act.

2.     The Defendant is San Jacinto River Authority ("SJRA"), a political subdivision created by the Texas Legislature to conserve, control, and utilize the storm and flood waters of the San Jacinto River and its tributary streams.  One of SJRA's primary missions is to control flood waters in the San Jacinto River Basin.  But instead of focusing on this important mission—as clearly evidenced by its abject failure during Hurricane

Harvey—SJRA has instead spent its time, energy, and limited funds over the past two decades monopolizing the supply of wholesale raw water in Montgomery County, Texas, resulting in artificially increased prices for all water consumers in the County and significantly impairing interstate commerce.

3.     Plaintiffs are investor owned utilities which have been injured by SJRA's violations of federal law, and therefore bring this suit under Section 16 of the Clayton Act to enjoin SJRA from continuing to harm Plaintiffs through maintenance of its illegal monopoly and price fixing of wholesale raw water supplies.  In violation of Sections 1 and 2 of the Sherman Act, SJRA has conspired with others to unlawfully restrain trade, to monopolize, and to attempt to monopolize the market of wholesale raw water supplies in Montgomery County, Texas.  As a result of SJRA's unlawful acts, Plaintiffs have suffered severe economic damages and will continue to suffer such damages unless and until SJRA is enjoined from maintaining its monopoly and scheme to artificially inflate and fix the price of wholesale raw water in Montgomery County, Texas.

## II.
## PARTIES, JURISDICTION, AND VENUE

4.     Plaintiff, Quadvest, L.P., is a limited partnership organized under the laws of the State of Texas with its principal office in Montgomery County, Texas.

5.     Plaintiff, Woodland Oaks Utility, L.P., is a limited partnership organized under the laws of the State of Texas with its principal office in Montgomery County, Texas.

6.      Defendant, San Jacinto River Authority, is a political subdivision of the State of Texas, created by the Texas Legislature in 1937 during the 45th Regular Session. It may be served with process through its General Manager, Jace A. Houston, at 1577 Dam Site Road, Conroe, Texas 77304.

7.      This Court has subject matter jurisdiction pursuant to 15 U.S.C. § 26, which authorizes this Court to enjoin violations of the nation's antitrust laws.

8.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1391(c) because it is where the Defendant resides and because it is where all, or a substantial part, of the events and omissions giving rise to the claims occurred.

### III.
### FACTS

**A.      Introduction to the Players in this Story.**

9.      San Jacinto River Authority is a political subdivision created by the Texas Legislature in 1937 to conserve, control, and utilize the storm and flood waters of the San Jacinto River and its tributary streams.   SJRA's jurisdictional authority encompasses Montgomery County and includes Lake Conroe, the primary source of raw surface water in Montgomery County.   Importantly, SJRA's reach is limited by statute to surface water only; SJRA has no authority to regulate groundwater.[1]   SJRA is both a wholesaler and

---

[1] *See, e.g.* Acts of 1937, 45th Leg., Chap. 426, §§ 1-3 (authorizing SJRA to control, store, preserve and distribute "storm and flood waters" of the San Jacinto River and its tributaries).   When the old Texas Vernon's Statutes were re-codified, SJRA's enabling statutes were deleted from Vernon's but not relocated to a new Code; thus, the reason for citing to the original laws.   SJRA has compiled, into a single document, the current version of its enabling statute as amended from time to time.   A copy of that compilation is attached hereto as **Exhibit 1** for the Court's convenience.   The underlying original laws from which the summary was compiled by SJRA are also attached hereto as **Exhibits 2-13**.

retailer of raw surface water.  Wearing its wholesaler hat, SJRA sells raw water to various utilities that re-sell the water retail to their end-user customers.  SJRA also sells water as a retailer to its own end-user customers.

10.     Quadvest, L.P. ("Quadvest") is a privately-owned utility commonly referred to as an "investor owned utility" or "IOU."  Quadvest's headquarters is in Montgomery County and, among other things, it provides drinking water to retail consumers throughout the County.  Quadvest's primary (but not only) business model involves contracting with real estate developers who are building new suburban neighborhoods.  Quadvest builds the water and wastewater utility systems for these developments and then becomes the utility provider for the homeowners once they move into their new homes.  For its raw water supply, Quadvest relies exclusively on wells that pump groundwater from aquifers located under Montgomery County.  Quadvest owns its own wells and does not buy surface water from SJRA.  Quadvest supplies drinking water to approximately 15,000 customers of Montgomery County.

11.     Woodland Oaks Utility, L.P. ("Woodland Oaks," or together with Quadvest, "Plaintiffs") is also an IOU that relies exclusively on groundwater to supply drinking water to about 1,200 residential and 25 commercial customers in Montgomery County.

## B.     Montgomery County Historically Relied on Groundwater.

12.     Groundwater is plentiful in Montgomery County, which sits atop two underground aquifer systems, the Gulf Coast system and the Catahoula formations. According to a report prepared for the Texas Water Development Board in 2014, the total

estimated amount of groundwater underlying Montgomery County in the Gulf Coast system is 180,000,000 acre-feet.[2]   An acre-foot of water is about 326,000 gallons, so Montgomery County is sitting on 58,680,000,000,000 gallons of groundwater.

13.     Not only was it plentiful, but groundwater in Montgomery County was historically less expensive than surface water.  There are many complex reasons for this, but one big reason is proximity.  Water wells can typically be drilled close to the areas where the water is to be used, whereas surface water has to be transmitted from Lake Conroe to the end users, some of whom are many miles from the lake.

14.     Because groundwater was cheap and plentiful in Montgomery County, and because Lake Conroe wasn't built until the early 1970s, virtually all of the water used in Montgomery County until recently was groundwater.[3]   Quadvest, for example, has been providing drinking water to residents of Montgomery County, using only groundwater, for years.

15.     Even SJRA got into the groundwater business in ~1975, when it acquired water wells and became the regional water supplier to The Woodlands, wholesaling raw groundwater to the various Municipal Utility Districts that serve the area.[4]

---

[2] The Texas Water Development Board's 2014 study regarding the Total Estimated Recoverable Storage ("TERS Report") did not include an analysis of the Catahoula formation, which is also in Montgomery County.  A copy of the TERS Report is attached hereto as **Exhibit 14.**

[3] Gulf States Utilities used surface water from its Lewis Creek Reservoir and a handful of users relied on diversions from the San Jacinto River for irrigation purposes.

[4] As noted above, the Texas Legislature's grant of authority to SJRA specifically encompasses surface water and related issues, but not groundwater.  As will be discussed in greater detail, however, SJRA has never been particularly concerned with staying in its lane.  Or complying with the law.

## C.    SJRA Decides It Wants to Sell Surface Water to The Woodlands.

16.    In the late 1980s, SJRA foresaw the coming population boom in The Woodlands of Montgomery County, Texas.  SJRA desperately wanted to sell drinking water to all those new rooftops, but it had a problem.  Although Lake Conroe had a plentiful raw water supply, SJRA didn't have the infrastructure in place to either treat the raw water or to transmit it to The Woodlands.  And the estimated cost to build the necessary infrastructure was a whopping $500,000,000.

17.    SJRA's then-limited customer base was just too small to support the rate structure that would be required to finance the necessary capital expenditures.[5]  SJRA needed to somehow guarantee itself more wholesale customers of raw surface water.

## D.    SJRA Settles on "Surface Water Conversion" as Its Solution.

18.    In the mid to late 1980s, SJRA looked around and noticed that many water-related entities in Southeast Texas were considering "surface water conversion" as a strategy for long-term planning.[6]  In particular, the Harris-Galveston Coastal Subsidence District ("HGCSD") adopted a plan in 1985 that required certain groundwater users to convert at least 80% of their production to surface water by the year 2005.  This requirement affected groundwater users in the North Harris County Water Supply Corporation ("NHCWSC") area, who planned to meet the requirement by obtaining surface water from Lake Houston.  NHCWSC therefore began a cooperative effort with

---

[5] *See* PowerPoint Slide deck entitled "San Jacinto River Authority Legislative Needs" at p. 5, copy attached as **Exhibit 15.**

[6] *See* San Jacinto River Authority Water Resources Development Plan, May 1988, copy attached as **Exhibit 16**.

the City of Houston to design and build a new water treatment plant and the associated transmission lines.

19.     Similarly, the West Harris County Water Supply Corporation was affected by HGCSD's 80% surface water conversion requirement and by 1988 was developing a plan to take water from some combination of Lake Houston and the Brazos River.

20.     Around this same time, the Northeast Harris County Water Supply Corporation was formed for the purpose of preparing a surface water conversion plan to comply with the HGCSD's 80% conversion rule.  It began looking seriously at an option to participate in the NHCWSC-City of Houston plan to build a new treatment plant and the associated transmission lines.

21.     So SJRA concluded that the solution to its problem was to somehow require all of those groundwater users in Montgomery County to start buying surface water from SJRA instead.  Of course, that solution had its own set of problems, not the least of which was that SJRA had no authority to regulate groundwater.

**E.     A Lone Star is Born.**

22.     What SJRA needed was a groundwater conservation district that it could control.  And that's exactly what SJRA got.

23.     SJRA successfully lobbied the legislature to create the Lone Star Groundwater Conservation District ("Lone Star") in 2001.[7]  Lone Star was charged with

---

[7] *See* Acts of 2001, 77th Leg., Chap. 1321, § 1.  (Like the SJRA, Lone Star's enabling statute is no longer codified; thus, the reason for the archaic citation form).  The creation of Lone Star was subject to a confirmation election, at which the voters approved its creation.

regulating the groundwater in Montgomery County.[8]   The initial enabling statute permitted Montgomery County stakeholders to appoint members to Lone Star's Board, and remarkably, those Board members were specifically exempted from the Texas Water Code's ethical rules regarding conflicts of interest.[9]  This exemption allowed SJRA to pack the Lone Star Board with members sympathetic to SJRA's surface water conversion plan. For example, Lone Star's original Board included Jim Adams, who was the General Manager of SJRA at the time.  SJRA also managed to get Orval Love, Jim Stinson, and Richard Tramm appointed to the Lone Star Board, all of whom were more than sympathetic to SJRA's goals.[10]

**F.      SJRA and Lone Star Form the Surface Water Conversion Task Force.**

24.     SJRA and Lone Star almost immediately began conspiring with one another to come up with a way for SJRA to monopolize all of the raw water supply in Montgomery County.[11]  By 2004, SJRA and Lone Star were publicly admitting to having initiated what they called "joint planning" sessions.  And at Lone Star's Board meeting on December 13, 2005, Orval Love, then President of Lone Star, announced the formal creation of the Surface Water Conversion Task Force and appointed himself to serve on the task force along with Jim Adams and Rigby Owen.

---

[8] *See Id.* at § 5.

[9] *See Id.* at § 6(h).

[10] The Texas Legislature subsequently amended Lone Star's enabling statute by requiring Board Members to be elected instead of appointed.  The Legislature also removed Lone Star's exemption from the Water Code's ethical rules so that its Board Members are now bound by conflicts of interest prohibitions. *See* Acts of 2015, 84th Leg., Chap. 646, § 1.

[11] While the conspiracy between SJRA and Lone Star no doubt violates the Sherman Act and is an important background element in this long story, SJRA's communications with Lone Star do not form the basis of Plaintiffs' claims.

25.     When the joint Surface Water Conversion Task Force was announced in December 2005, Lone Star admitted that it was "build[ing] off the facilities implementation planning effort of the Lone Star GCD and the SJRA."[12]  The reference to "facilities implementation planning" was code for SJRA's plan to build its massive $500,000,000 infrastructure project that would provide surface water to The Woodlands.

26.     The following month, Lone Star once again reported publicly that it was working with SJRA to identify a "feasible and cost-efficient wholesale surface water supply solution for Montgomery County,"[13] which is an oblique reference to SJRA's plan to monopolize the supply of raw water in Montgomery County.  Shockingly, Lone Star also admitted that it was working hand-in-hand with SJRA to help it figure out how to fund SJRA's massive "facilities implementation plan."

27.     Toward this end, Lone Star hired its own outside counsel, David Crews, to help finalize a scheme that would eventually require groundwater users in Montgomery County to fund SJRA's $500,000,000 infrastructure project.[14]

28.     On April 11, 2006, certain members of the joint Surface Water Conversion Task Force conducted a "Coordination Meeting" during which they discussed ways in which Lone Star might be able to help SJRA accomplish its two-headed objective of (i) creating a monopoly over wholesale raw water in Montgomery County, and (ii) fixing the prices of wholesale raw water in Montgomery County.  Attendees included Mike

---

[12] *See* Lone Star's Meeting Minutes of 12/13/05 at p. 6, attached hereto as **Exhibit 17.**

[13] *See* Lone Star's Meeting Minutes of 1/10/06 at p. 3, attached hereto as **Exhibit 18.**

[14] *See Id.* at p. 4.

Page, who was then SJRA's outside counsel, and Brian Sledge, who was acting as Lone Star's outside counsel at the time.  Alan Potok, an engineer at Turner Collie & Braden ("TCB"), also attended the meeting.  The meeting concluded with an agreement that lawyers Page and Sledge would work together to document the parties' express agreement to violate the Sherman Act in a written "Memorandum of Understanding."[15] Additional coordination meetings were held on June 13, 2006,[16] August 1, 2006,[17] August 8, 2006,[18] September 12, 2006[19] and October 10, 2006,[20] among other dates.

29.    In furtherance of their conspiracy to violate the Sherman Act, Lone Star and SJRA jointly published in June 2006 an engineering study entitled, <u>Regulatory Study and Facilities Implementation Plan for Lone Star Groundwater Conservation District and San Jacinto River Authority</u>.[21]  This report was authored by TCB's engineer, Alan Potok, the same Alan Potok who'd been participating in the Surface Water Conversion Task Force meetings.  In the TCB Report, Potok specifically addressed how Lone Star and SJRA could work cooperatively to set up a system by which groundwater users like Plaintiffs could be forced to help fund SJRA's $500,000,000 facilities implementation plan.[22]  To give the TCB Report an air of legitimacy, Lone Star and SJRA solicited funding from the Texas

---

[15] *See* Coordination Meeting Minutes of 4/11/06, attached hereto as **Exhibit 19.**

[16] *See* Lone Star's Meeting Minutes of 6/13/06 at p. 5, attached hereto as **Exhibit 20.**

[17] *See* Lone Star Agenda for 8/1/06, attached hereto as **Exhibit 21.**

[18] *See* Lone Star Meeting Minutes of 8/8/06 at p. 5, attached hereto as **Exhibit 22.**

[19] *See* Lone Star Meeting Minutes of 9/12/06 at p. 5, attached hereto as **Exhibit 23.**

[20] *See* Lone Star Meeting Minutes of 10/10/06 at p. 4, attached hereto as **Exhibit 24.**

[21] *See* <u>Regulatory Study and Facilities Implementation Plan for Lone Star Groundwater Conservation District and San Jacinto River Authority</u>, June 2006 (hereinafter the "TCB Report"), copy attached hereto as **Exhibit 25.**

[22] *Id.* at pp. 61 et seq.

Water Development Board ("TWDB") to help pay for the study and then slapped the TWDB logo on the cover page to imply its conclusions were made by the TWDB itself.[23]

30.     After Engineer Potok finished the self-serving TCB Report, lawyers Sledge and Page relied on it to draft their Memorandum of Understanding ("MOU"), including statements in the recitals such as "the TWDB Study determined that surface water supplies will be necessary to augment the groundwater resources in the County . . . ."[24] In reality, the TCB Report was created only to support Lone Star's pre-determined conclusion that groundwater usage should be curtailed, which in turn was justification for SJRA's plan to seize control of wholesale raw water supplies in Montgomery County as a means to fund its facilities implementation plan.  Indeed, the entire 98 page report (excluding Appendices) was premised on a single, untested assumption that the total amount of usable groundwater available from the Gulf Coast aquifer system was only 64,000 acre-feet per year:  "In its 2004 Groundwater Management Plan, [Lone Star] estimates the amount of usable groundwater available from the Gulf Coast aquifer system to be 64,000 acre-feet per year . . . ."[25]  Based solely on this "estimate,"[26] the TCB

---

[23] *Id.* at cover page.

[24] *See* Memorandum of Understanding by and between Lone Star Groundwater Conservation District and San Jacinto River Authority Regarding Conjunctive Management and Wholesale Water Supply in Montgomery County, Texas, Nov. 14, 2006, at p. 1, copy attached here as **Exhibit 26**.

[25] *See* TCB Report (**Exhibit 25**) at p. 12.

[26] In reality, the 64,000 acre-feet number was pulled from thin air (*see, e.g.*, 8/11/2014 Memorandum of Call at **Exhibit 27**) and pales in comparison to the amount of groundwater actually available in Montgomery County.  Per the Texas Water Development Board's 2014 study regarding the Total Estimated Recoverable Storage ("TERS Report") for groundwater in and around Montgomery County (**Exhibit 14**), there is 180,000,000 acre-feet available in the Gulf Coast aquifer.  Assuming zero recharge, it would take almost three millennia to deplete the Gulf Coast aquifer.  And these numbers don't even include the Catahoula formation, which is another source of groundwater in Montgomery County.

Report projected that future demand would exceed 64,000 acre-feet per year, and reached SJRA's conclusion that groundwater users must convert to surface water, which of course would require massive new infrastructure.

31.     In what can only be described as shockingly brazen, the MOU actually reduced to writing the agreement between Lone Star and SJRA to create a monopoly over wholesale raw water supplies in Montgomery County as a means to help SJRA raise cash to fund its facilities implementation plan.  Among other things, the MOU expressly says that Lone Star and SJRA will "pursue a cooperative implementation strategy . . . to finance and provide wholesale surface water to converting [groundwater] users . . . ."[27]  In other words, it's an agreement to create an SJRA controlled monopoly in violation of the Sherman Act.

32.     The MOU also set forth the scheme to charge fees to groundwater users, regardless of whether they buy surface water from SJRA, so as to spread the cost of SJRA's capital improvements to a wider audience.[28]  Further, the fees assessed to groundwater users are expressly to be used to "equalize the cost of groundwater and surface water" in Montgomery County.[29]  Which, of course, is an illegal agreement to fix prices in violation of the Sherman Act.

---

[27] *See* MOU (**Exhibit 26**) at ¶ 4.

[28] *Id*. at ¶ 4.

[29] *Id*. at ¶ 6.

**G.      Lone Star's "Rule."**

33.      As part of their coordination efforts, SJRA and Lone Star agreed that Lone Star would adopt a groundwater conservation plan that would impose severe limits on groundwater as a means to force large volume groundwater users ("LVGUs")[30] in Montgomery County to begin using surface water (acquired from SJRA, of course).[31]

34.      And so Lone Star began work to implement its "District Regulatory Plan" or "DRP" in three phases it labeled Phase I, Phase II(A) and Phase II(B).  The DRP is complicated, but for this discussion, the critical piece is that it implemented a rule (the "Rule") requiring all LVGUs in Montgomery County to reduce their groundwater consumption by 30% as compared to the volume they had pumped in 2009.[32]  And to give the Rule some teeth, violators would be fined $10,000 per day per violation.[33]

**H.      SJRA's "GRP."**

35.      While Lone Star was working to implement the Rule, SJRA was working on developing a groundwater reduction plan, or GRP.[34]  The proposed GRP was to be fairly complex, but a key component of the GRP was to allow participating LVGUs to pool

---

[30] In this context, a "large volume groundwater user" is any groundwater user who produces more than 10 million gallons per year, a number only slightly above the amount that can be produced for domestic or livestock use, which is by statute exempt from any regulation.

[31] *See* MOU (**Exhibit 26**) at ¶ 6.

[32] Phase II(A) was adopted February 12, 2008 and is attached hereto as **Exhibit 28**.  Phase II(A) was amended and restated as of March 10, 2009 and is attached hereto as **Exhibit 29**.  Phase II(B) was adopted November 10, 2009 and is attached hereto as **Exhibit 30**.  Phase II(B) was amended and restated on April 22, 2010 (**Exhibit 31**), again on November 12, 2013 (**Exhibit 32**), again on July 14, 2015 (**Exhibit 33**), and once again on December 8, 2015 (**Exhibit 34**).

[33] As it turns out, Lone Star's Rule was illegal, and the District Court sitting in Montgomery County eventually set it aside.  *See infra* ¶¶ 52-54.

[34] SJRA worked on its GRP for several years, and eventually finalized it in March 2011.  A copy of the final GRP is attached hereto as **Exhibit 35**.

together so that their groundwater consumption would be measured collectively, instead of individually, to determine whether they were in compliance with Lone Star's new groundwater limits.  The idea was that some LVGUs could "over convert" to surface water, leaving room for other LVGUs to continue using more groundwater than was otherwise permitted.  Either way, SJRA would benefit.  For those LVGUs who converted to surface water, SJRA gained new wholesale customers.  And the LVGUs who elected to continue using their own well water were required to pay pumpage fees to SJRA for the privilege.

36.     SJRA initially intended to implement and enforce its planned GRP through its own rule-making authority.  But it had a slight problem:  the legislature hadn't given SJRA any authorization to regulate groundwater; nor did SJRA have any statutory grant that would permit it to monopolize wholesale surface water,[35] or to require groundwater users to pay fees to SJRA for the privilege of pumping their own well water, or to fix prices of all wholesale raw water supplies in Montgomery County.

**I.     SJRA Tried—But Failed—to Get Statutory Authority for Its GRP.**

37.     Recognizing that it lacked statutory authority to accomplish its goals, SJRA lobbied the Texas Legislature to amend its enabling statute.[36]  During the 2009 legislative session, Representative Eissler introduced House Bill 4804, which would have amended SJRA's enabling statute to authorize SJRA to, among other things:

---

[35] Section 13.001 of the Texas Water Code purports to grant monopoly rights to *retail* public utilities. *See* Tex. Water Code § 13.001(b)(1). But this grant does not extend to wholesale raw water.

[36] *See* PowerPoint Slide deck entitled "San Jacinto River Authority Legislative Needs" at passim, copy attached as **Exhibit 15**

     a.       regulate groundwater in Montgomery County;[37]

     b.       adopt and enforce a groundwater reduction plan;[38]

     c.       require Montgomery County groundwater users to buy water from SJRA instead of using their own groundwater;[39]

     d.       prevent groundwater users from importing alternative sources of water from outside Montgomery County;[40] and

     e.       charge fees to groundwater users for pumping water from their own wells.[41]

38.     HB 4804 would also have authorized SJRA to design, finance, and construct its $500,000,000 expansion project.[42]  Similarly, Senator Williams introduced Senate Bill 2489 that was virtually identical to HB 4804.[43]  Like its House Bill counterpart, SB 2489 would have expanded SJRA's authority to permit it to regulate groundwater, adopt and enforce a groundwater reduction plan, require groundwater users to buy surface water from SJRA, and charge fees to pump their own well water.[44]

39.     But the Texas Legislature refused to expand SJRA's reach into groundwater.  Neither HB 4804 nor SB 2489 was adopted.  SJRA's enabling statute was not amended, and to this day, SJRA has no statutory authority to regulate groundwater,

---

[37] *See* HB 4804 at p. 4, ll. 2-6, attached hereto as **Exhibit 36.**

[38] *Id*. at p. 4, ll. 2-9.

[39] *Id*. at p. 4, ll. 19-21.

[40] *Id*. at p. 5, ll. 1-3.

[41] *Id*. at p. 14, ll. 5-7.

[42] *Id*. at passim.

[43] *See* SB 2489, attached hereto as **Exhibit 37.**

[44] *Id*. at passim.

to adopt or enforce a groundwater reduction plan, to require groundwater users to buy surface water from SJRA, to limit groundwater users from importing water from outside Montgomery County, or to assess fees against groundwater users for pumping their own well water.

40.     In short, SJRA has no legislative grant to monopolize wholesale raw water in Montgomery County or to fix the price of wholesale raw water in Montgomery County.

**J.      The GRP Contracts.**

41.     Although the Texas Legislature rebuffed SJRA's attempts to move into groundwater regulation and to monopolize wholesale raw water in Montgomery County, SJRA forged ahead with its plan.  Rather than relying on the rule making authority that the Texas Legislature had refused to grant, SJRA instead sought to give itself the power to monopolize and fix the price of Montgomery County's wholesale raw water supplies through a series of GRP Contracts.[45]  As explained in greater detail below, these GRP Contracts would purport to give SJRA the contractual authority to do the very things that the Texas Legislature refused to authorize.

42.     To "encourage" the Montgomery County LVGUs to participate in SJRA's GRP, SJRA worked with Lone Star to finalize the Rule.  And on November 10, 2009, Lone Star did just that, adopting Phase II(B) of its District Regulatory Plan.[46]

---

[45] SJRA prepared a PowerPoint slide deck to explain the GRP Contracts in which it admitted its legislative defeat necessitated its reliance on the GRP Contracts.  *See* "Questions and Answers" slide deck at p. 9, attached as **Exhibit 15**.

[46] *See* **Exhibit 30**.

43.     SJRA then presented its GRP to the Montgomery County LVGUs, explaining that participation in SJRA's planned GRP would provide a safe harbor against Lone Star's threatened $10,000 daily fine.  But the price of admission to SJRA's GRP was steep.  It required the LVGUs to sign on to SJRA's GRP Contracts, which each Plaintiff did[47] because they had no other option but to join.

44.     Those GRP Contracts required each signatory/participant to pay SJRA fees for pumping groundwater—groundwater that the participants owned, using wells the participants paid to drill and maintain.  In other words, Plaintiffs were required to pay SJRA fees for using their own groundwater.[48]

45.     The GRP Contracts specifically contemplated that SJRA would use the pumpage fees to finance SJRA's massive public works project.[49]  And once the facilities' expansion was complete, the GRP Contracts gave SJRA the option to require Plaintiffs to connect to SJRA's facilities for the purpose of purchasing raw water from SJRA.[50]  And once connected to SJRA's system, SJRA had the contractual right to dictate how much water each participant must take (or pay for even if they don't receive it).[51]

---

[47] Each Plaintiff signed its own version of the GRP Contract, but the terms of each contract are essentially identical.  Quadvest's contract is dated as of June 1, 2010 and was amended in 2012 when Quadvest acquired wells from another GRP participant, HHJ, Inc. d/b/a Decker Utilities.  Quadvest's original GRP contract is attached hereto as **Exhibit 38** and the 2012 amendment is attached hereto as **Exhibit 39**.  Ranch Utilities, L.P., a former affiliate of Quadvest, signed a GRP Contract also dated as of June 1, 2010, a copy of which is attached hereto as **Exhibit 40**.  Ranch Utilities was subsequently merged into Quadvest, which assumed the Ranch Utilities GRP Contract.  Woodland Oaks' contract is dated as of June 1, 2010 and is attached hereto as **Exhibit 41**.

[48] *See*, *e.g.*, Quadvest's GRP Contract (**Exhibit 38**) at § 6.02.

[49] *Id.* at Article IV.

[50] *Id.* at § 4.05.

[51] *Id* at § 4.09.

46.     Another "feature" of the GRP Contracts was that the pumpage fees were calculated and assessed so as to equalize the cost of otherwise less expensive groundwater with the cost of surface water.[52]   The intent—and actual effect—of this clause was to make sure that all raw water purchased in Montgomery County was sold at the same rate.[53]

47.     Through these GRP Contracts, SJRA took for itself the very power the Texas Legislature had refused to grant.

**K.     SJRA Closes Loopholes.**

48.     SJRA recognized that its plan to monopolize the raw water in Montgomery County had a couple of significant loopholes.  SJRA owns the rights to only one-third of the surface water in Lake Conroe; the rest is owned by the City of Houston.

49.     To prevent LVGUs from converting to surface water owned by the City of Houston (which would have defeated SJRA's goal of using LVGU fees to finance its $500,000,000 expansion project), SJRA negotiated a deal with the City of Houston by which SJRA acquired rights of first refusal to the City's water rights in Lake Conroe.[54] Even if Plaintiffs want to do so, they cannot buy water from City of Houston unless SJRA allows them to.[55]  Worse, the contract between SJRA and the City of Houston prohibits the City from selling any lake water to any person or entity subject to the groundwater

---

[52] *Id*. at § 6.02.

[53] *Id*. at §§ 6.02, 6.04.

[54] *See* Water Supply Contract Between City of Houston and San Jacinto River Authority at ¶¶ 2.1, 2.2, attached as **Exhibit 42**.

[55] *Id*. at ¶ 2.2(c).

reduction requirements of Lone Star's Rule.[56]   This effectively clinches SJRA's control over all of the wholesale surface water in Lake Conroe.

50.     To complete its hold on the water supplies available in Montgomery County, SJRA also entered into an option contract with the only other viable surface water provider, Trinity River Authority ("TRA"), under which SJRA essentially takes any excess TRA water off the market by purchasing a right of first refusal.[57]

51.     In short, SJRA has an absolute stranglehold on all of the wholesale raw water in Montgomery County, whether the source of the water is surface water or groundwater.

**L.      Rule is Set Aside as Invalid.**

52.     SJRA was not the only actor in this play to exceed its statutory authority.  In 2015, Plaintiffs and others filed suit against Lone Star to challenge the validity of the Rule on the grounds that Lone Star had no statutory authority to require all LVGUs in Montgomery County to reduce their consumption by 30% as measured against their 2009 usage.  The 284th Judicial District Court of Montgomery County agreed with Plaintiffs and entered a Final Judgment on May 17, 2019, declaring the Rule invalid ab initio.[58]

53.     Unfortunately for Plaintiffs, however, they were locked into the GRP Contracts by the time the Rule was set aside.  So, although the purported justification for

---

[56] *Id.*

[57] *See* Option for Raw Water Supply Contract Between the Trinity River Authority and San Jacinto River Authority at Arts. 1 & 2, attached as **Exhibit 43**.

[58] A true and correct copy of the Final Judgment from the Rule invalidation suit is attached hereto as **Exhibit 44**.

the GRP no longer exists, SJRA has no plans to cancel the GRP Contracts because they are essential to SJRA's monopolization of the wholesale raw water supplies of Montgomery County.

54.     Plaintiffs are therefore stuck with these GRP Contracts that SJRA claims are enforceable, even though the Lone Star Rule has been invalidated and even though they violate the Sherman Act.

## IV.
## CAUSES OF ACTION

**A.     Claim One:  Violation of Section 1 of Sherman Act.**

55.     The factual statements set forth above in Section III are incorporated herein by this reference.

56.     The GRP Contracts between Plaintiffs and SJRA constitute a violation of Section 1 of the Sherman Act, which declares that "[e]very contract . . . in restraint of trade or commerce among the several States" is illegal.  15 U.S.C. § 1.  Among other things, the GRP Contracts fix the price of raw water in Montgomery County by assessing pumpage fees to LVGU participants so as to equalize the price of groundwater with surface water,[59] require Plaintiffs to pay fees to SJRA for the privilege of pumping their own groundwater,[60] give SJRA the option to require Plaintiffs to buy wholesale surface water

---

[59] *See, e.g.,* Quadvest's GRP Contract (**Exhibit 38**) at Article VI.

[60] *Id.* at § 6.02.

from SJRA in amounts dictated by SJRA,[61] and impair Plaintiffs' ability to procure wholesale raw water from other sources at competitive rates.[62]

57.     Each Plaintiff has suffered severe economic injury as a result of SJRA's violations of the Sherman Act.  Quadvest has already paid SJRA more than $18 million for the privilege of pumping its own groundwater, and Woodland Oaks has similarly paid SJRA more than $3 million.

58.     These monthly pumpage fees substantially affect interstate commerce in a multitude of ways, including *inter alia* the following:

a.     Each Plaintiff funds its operations—including the sizable monthly pumpage fees paid to SJRA—with loans and/or lines of credit from a Denver, Colorado based cooperative that specializes in financing IOUs.  The excessive pumpage fees required under the GRP Contracts impact Plaintiffs' cash flows and balance sheets, thereby affecting their credit ratings/worthiness and credit terms.

b.     Each Plaintiffs' operations require equipment, such as pumps, motors, tanks, and electrical equipment that are sourced from vendors located outside Texas.  The excessive pumpage fees negatively affect Plaintiffs' cash flows and abilities to acquire required equipment from out-of-state suppliers.

c.     Each Plaintiff employs dozens of persons, some of whom are out-of-state transfers.  The excessive pumpage fees negatively impair Plaintiffs' abilities

---

[61] *Id.* at Article IV.

[62] *Id.* at § 6.04(i) (SJRA can assess fees against LVGUs who buy water from alternate sources).

to expand their businesses and reduce their need to hire additional out-of-state employees.

59.     Moreover, Plaintiffs' rates for treated water sold retail to end-users are higher than they would otherwise be because of the GRP Contracts.  The nature of the population growth in Montgomery County means that many of the homes to which Plaintiffs sell water retail are in neighborhoods that attract potential new residents from out-of-state, and those interstate home-buyers are thereby affected by the GRP Contracts, either because they must pay higher retail water rates after moving to Texas, or by discouraging them from relocating to Montgomery County in the first place.

60.     Further, SJRA's violations of the Sherman Act squeeze interstate commerce because its GRP directly impacts wholesale raw surface water drawn from Lake Conroe, which is a water of the United States.  Lake Conroe is a habitat for fish that may be sold into interstate commerce, and is part of the San Jacinto River, which feeds into Galveston Bay.

61.     So long as SJRA enforces the GRP Contracts—whose terms are practically indefinite[63]—Plaintiffs will continue to suffer economic injury that substantially affects interstate commerce.  Plaintiffs therefore seek an injunction[64] under 15 U.S.C. § 26 to prevent SJRA from enforcing the GRP Contracts or taking any other acts to enforce the GRP.

---

[63] *Id*. at § 12.01 (term extends for as long as SJRA has outstanding Bonds related to the Project); § 4.01 (SJRA has exclusive right to control the Project).

[64] Plaintiffs do not seek an award of money damages, which is expressly disallowed by statute. *See* 15 U.S.C. § 35.

**B.**     **Claim Two:  Violation of Section 2 of Sherman Act.**

62.     The factual statements set forth above in Section III are incorporated herein by this reference.

63.     SJRA attempted to, and in fact did, monopolize the raw water supply of Montgomery County in violation of Section 2 of the Sherman Act.  15 U.S.C. § 2.  Among other things, the GRP Contracts require Plaintiffs to pay fees to SJRA for the privilege of pumping their own groundwater,[65] give SJRA the option to require Plaintiffs to buy wholesale surface water from SJRA in amounts dictated by SJRA,[66] and impair Plaintiffs' ability to procure wholesale raw water from other sources at competitive rates.[67]  Further, SJRA tied up alternative sources of raw surface water by contracting with City of Houston[68] and Trinity River Authority.[69]

64.     Each Plaintiff has suffered severe economic injury as a result of SJRA's violations of the Sherman Act.  Quadvest has already paid SJRA more than $18 million for the privilege of participating in SJRA's monopoly of wholesale water supplies in Montgomery County, and Woodland Oaks has similarly paid SJRA more than $3 million.

65.     The amount of fees paid by Plaintiffs substantially affect interstate commerce in a multitude of ways, including *inter alia* the following:

---

[65] *Id.* at § 6.02.

[66] *Id.* at Article IV.

[67] *Id.* at § 6.04(i) (SJRA can assess fees against LVGUs who buy water from alternate sources).

[68] *See supra* ¶ 49.

[69] *See supra* ¶ 50.

a. Each Plaintiff funds its operations—including the sizable monthly pumpage fees paid to SJRA—with loans and/or lines of credit from a Denver, Colorado based cooperative that specializes in financing IOUs. The excessive pumpage fees required under the GRP Contracts impact Plaintiffs' cash flows and balance sheets, thereby affecting their credit rating/worthiness and credit terms.

b. Each Plaintiffs' operations require equipment, such as pumps, motors, tanks, and electrical equipment, that are sourced from vendors located outside Texas. The excessive pumpage fees negatively affect Plaintiffs' cash flows and ability to acquire required equipment from out-of-state suppliers.

c. Each Plaintiff employs dozens of persons, some of whom are out-of-state transfers. The excessive pumpage fees negatively impair Plaintiffs' abilities to expand their businesses, and reduce their need to hire additional out-of-state employees.

66. Moreover, Plaintiffs' rates for treated water sold retail to end-users are higher than they would otherwise be because of SJRA's monopoly. The nature of the population growth in Montgomery County means that many of the homes to whom Plaintiffs sell water retail are in neighborhoods that attract potential new residents from out-of-state, and those interstate home-buyers are thereby affected by SJRA's monopoly, either because they must pay higher retail water rates after moving to Texas, or by discouraging them from relocating to Montgomery County in the first place.

67. Further, SJRA's violations of the Sherman Act squeeze interstate commerce because its GRP directly impacts wholesale raw surface water drawn from Lake Conroe,

which is a water of the United States.  Lake Conroe is a habitat for fish that may be sold into interstate commerce, and is part of the San Jacinto River, which feeds into Galveston Bay.

68.     So long as SJRA enforces the GRP Contracts—whose terms are practically indefinite[70]—Plaintiffs will continue to suffer economic injury that substantially affects interstate commerce.  Plaintiffs therefore seek an injunction[71] under 15 U.S.C. § 26 to prevent SJRA from enforcing the GRP Contracts[72] or taking any other acts to enforce the GRP, to monopolize or attempt to monopolize wholesale raw water in Montgomery County, or to fix prices of wholesale raw water supplies in Montgomery County.

## V.
## SJRA IS NOT IMMUNE

69.     SJRA does not enjoy *Parker* state action immunity because the State of Texas has neither authorized SJRA to restrain trade in violation of the Sherman Act, nor does the State actively supervise SJRA's enforcement of the GRP and/or the GRP Contracts.  Nothing in SJRA's enabling statute grants it authority to regulate groundwater, or to enforce its GRP, or to require groundwater users to pay it a fee for the privilege of

---

[70] *Id.* at § 12.01 (term extends for as long as SJRA has outstanding Bonds related to the Project); § 4.01 (SJRA has exclusive right to control the Project).

[71] Plaintiffs do not seek an award of money damages, which is expressly disallowed by statute.  *See* 15 U.S.C. § 35.

[72] That is, the Quadvest GRP Contract as amended in 2012 (**Exhibits 38** and **39**), the Ranch Utilities GRP Contract assumed by Quadvest when Ranch Utilities was merged into Quadvest (**Exhibit 40**), and the Woodland Oaks GRP Contract (**Exhibit 41**).

pumping their own well-water.[73]  Indeed, SJRA's enabling statute actually requires it to follow the laws of the United States, including the Sherman Act.[74]

70.     SJRA knows this and sought authority from the Texas Legislature in 2009, which request was rejected.[75]  SJRA is not acting pursuant to a clearly articulated and affirmatively expressed state policy to displace competition with state regulation in the raw water wholesale marketplace.

71.     Similarly, the State of Texas is not actively supervising SJRA's enforcement of its GRP or the GRP Contracts.  There were no mechanisms created to supervise SJRA's actions because the State of Texas never even contemplated that SJRA would engage in monopolistic and/or price fixing behaviors in the raw water wholesale marketplace.

## VI.
## STATUTE OF LIMITATIONS

72.     Plaintiffs' claims are not barred by the statute of limitations because SJRA's conduct constitutes an ongoing and continuing violation of the Sherman Act.  Moreover, Plaintiffs do not seek to recover damages for past violations, but instead seek only to enjoin SJRA's future violations of the Sherman Act.

## VII.
## CONCLUSION AND PRAYER

The San Jacinto River Authority has been granted broad power by the State of Texas to conserve, control, and utilize the storm and flood waters of the San Jacinto River

---

[73] *See* SJRA's Enabling Statute (**Exhibit 1**) at §§ 1-3 (authorizing SJRA to manage and conserve surface water only).

[74] *Id*. at § 7(a).

[75] *See supra* ¶¶ 37-40.

and its tributary streams.  The State of Texas, however, has never imbued SJRA with any power to regulate groundwater, or to monopolize wholesale raw water in Montgomery County, or to artificially inflate the price of wholesale raw water in Montgomery County through a price fixing scheme.  In fact, the State of Texas has specifically restricted SJRA's authority to the limits placed on it by the laws of the United States.  SJRA's conduct is a direct and flagrant violation of the Sherman Act that significantly impairs interstate commerce and all those who consume water in Montgomery County.  This Court should not hesitate to enjoin SJRA from any further violations of the Sherman Act.

Respectfully submitted,

DuBOIS, BRYANT & CAMPBELL, LLP
303 Colorado Street, Suite 2300
Austin, TX  78701
(512) 457-8000
(512) 457-8008 (Facsimile)

By: _J. David Rowe_

      J. David Rowe
      State Bar No. 00794564
      Federal ID No. 21394
      drowe@dbcllp.com
      Seth E. Meisel
      State Bar No. 24037089
      Federal ID No. 435586
      smeisel@dbcllp.com
      Peter Gregg
      State Bar No. 00784174
      Federal ID No. 22745
      pgregg@dbcllp.com

ATTORNEYS FOR PLAINTIFFS
