IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| QUADVEST, L.P., | § | Case No. 19-CV-4508 |
| | § | |
| Plaintiff, | § | |
| | § | Assigned to: |
| v. | § | Judge George C. Hanks, Jr. |
| | § | |
| SAN JACINTO RIVER AUTHORITY, | § | |
| | § | |
| Defendant. | § | |
| | § | |

**DEFENDANT SAN JACINTO RIVER AUTHORITY'S
MOTION FOR SUMMARY JUDGMENT**

YETTER COLEMAN LLP
James E. Zucker
State Bar No. 24060876
jzucker@yettercoleman.com
Justin S. Rowinsky
State Bar No. 24110303
jrowinsky@yettercoleman.com
Luke A. Schamel
State Bar No. 24106403
lschamel@yettercoleman.com
811 Main St., Suite 4100
Houston, Texas 77002
(713) 632-8000

ATTORNEYS FOR SAN JACINTO RIVER
AUTHORITY

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ..........................................................................................ii

I.  Introduction and summary ...................................................................... 1

II. Factual and procedural background ........................................................ 2

III. Argument and authorities ...................................................................... 9

    A.  Standard of review.......................................................................... 9

    B.  Quadvest's claims are barred by the *Noerr-Pennington* doctrine. ............... 9

    C.  Quadvest's claims are barred by laches. ...................................... 11

    D.  Quadvest has failed to establish an antitrust injury.................... 14

    E.  The Court should dismiss Quadvest's §1 claim. ......................... 15

        1.  This is not a *per se* case.................................................. 15

        2.  The alleged "restraints" are justified under the rule of reason......... 16

    F.  The Court should dismiss Quadvest's §2 claim. ......................... 19

        1.  Quadvest has no competent evidence of market share.................... 20

        2.  Quadvest has not defined a relevant antitrust market. .................... 21

IV. Conclusion ........................................................................................... 25

CERTIFICATE OF SERVICE ............................................................................. 26

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*A Fisherman's Best, Inc. v. Recreational Fishing,*
*All.*, 310 F.3d 183 (4th Cir. 2002) ................................................................................. 9

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ...................................................................................................... 9

*Antoine L. Garabet, M.D., Inc. v. Autonomous Techs. Corp.,*
116 F. Supp. 2d 1159 (C.D. Cal. 2000) ...................................................................... 12

*Apani Sw., Inc. v. Coca-Cola Enters., Inc.,*
300 F.3d 620 (5th Cir. 2002) ...................................................................................... 23

*Bayou Fleet, Inc. v. Alexander,*
234 F.3d 852 (5th Cir. 2000) ...................................................................................... 10

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
429 U.S. 477 (1977) ..................................................................................................... 14

*Bus. Elec. Corp. v. Sharp Elec. Corp.,*
485 U.S. 717 (1988) ..................................................................................................... 16

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ...................................................................................................... 9

*City of Columbia v. Omni Outdoor Advert., Inc.,*
499 U.S. 365 (1991) ................................................................................................ 9, 10

*Colo. Interstate Gas Co. v. Natural Gas Pipeline Co.,*
885 F.2d 683 (10th Cir. 1989) ............................................................................... 21, 22

*Colsa Corp. v. Martin Marietta Servs., Inc.,*
133 F.3d 853 (11th Cir. 1998) .................................................................................... 20

*E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.,*
365 U.S. 127 (1961) ...................................................................................................... 9

*Ginsburg v. InBev NV/SA,*
623 F.3d 1229 (8th Cir. 2010) .................................................................................... 12

*Greenwood Utils. Comm'n v. Miss. Power Co.*,
  751 F.2d 1484 (5th Cir. 1985) .................................................. 10

*Hornsby Oil Co. v. Champion Spark Plug Co.*,
  714 F.2d 1384 (5th Cir. 1983) .................................................. 23

*Jebaco, Inc. v. Harrah's Operating Co.*,
  587 F.3d 314 (5th Cir. 2009) ............................................... 14, 17

*K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*,
  61 F.3d 123 (2d Cir. 1995) ..................................................... 16

*Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*,
  677 F.2d 1045 (5th Cir. 1982) .................................................. 12

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
  551 U.S. 877 (2007) ............................................................ 15

*McGuire Oil Co. v. Mapco, Inc.*,
  958 F.2d 1552 (11th Cir. 1992) ................................................ 10

*McWane, Inc. v. F.T.C.*,
  783 F.3d 814 (8th Cir. 2015) .................................................. 17

*Music, Inc. v. Columbia Broad. Sys., Inc.*,
  441 U.S. 1 (1979) ............................................................. 18

*N. Am. Soccer League, LLC v. U.S. Soccer Fed., Inc.*,
  883 F.3d 32 (2d Cir. 2018) .................................................... 18

*Nat'l R.R. Passenger Corp. v. Morgan*,
  536 U.S. 101 (2002) ....................................................... 11, 13

*New York v. Meta Platforms, Inc.*,
  66 F.4th 288 (D.C. Cir. 2023) ................................................. 11

*Pro-Football, Inc. v. Harjo*,
  415 F.3d 44 (D.C. Cir. 2005) .................................................. 13

*PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*,
  615 F.3d 412 (5th Cir. 2010) ............................................... 22, 23

*Rockbit Indus. U.S.A., Inc. v. Baker Hughes, Inc.*,
  802 F. Supp. 1544 (S.D. Tex. 1991) ........................................... 20

*Samsung Elecs. Co. v. Panasonic Corp.*,
  747 F.3d 1199 (9th Cir. 2014) ................................................ 11

*Spectrum Sports, Inc. v. McQuillan*,
    506 U.S. 447 (1993)................................................................................19

*Taleff v. Sw. Airlines Co.*,
    828 F. Supp. 2d 1118 (N.D. Cal. 2011) ...................................................12

*Taylor Pub. Co. v. Jostens, Inc.*,
    216 F.3d 465 (5th Cir. 2000) .................................................................21

*Transp. Co. v. Trucking Unlimited*,
    404 U.S. 508 (1972)................................................................................10

*United States v. Am. Airlines, Inc.*,
    743 F.2d 1114 (5th Cir. 1984) ...............................................................21

*United States v. Am. Express Co.*,
    838 F.3d 179 (2d Cir. 2016) ...................................................................17

*United States v. E.I. du Pont de Nemours & Co.*,
    351 U.S. 377 (1956)................................................................................22

*Valley Drug Co. v. Geneva Pharms., Inc.*,
    344 F.3d 1294 (11th Cir. 2003) .............................................................10

*Z Techs. Corp. v. Lubrizol Corp.*,
    753 F.3d 594 (6th Cir. 2014) .................................................................11

**Statutes**

15 U.S.C. §§15, 15a, 15b, 15c, 26..................................................................11

**Rules**

Fed. R. Civ. P. 56(a) ........................................................................................9

**Other Authorities**

Areeda & Hovenkamp, *Antitrust Law* §2004b ............................................16

Areeda & Hovenkamp, *Antitrust Law* §807i ...............................................22

*Horizontal Merger Guidelines*, U.S. DOJ & FTC (2010)...................... 21, 24, 25

# I. INTRODUCTION AND SUMMARY

This case is about buyer's remorse and politics by other means. It is one of several cases Quadvest is pursuing to get out of its contract with Defendant San Jacinto River Authority. But Quadvest's dispute with SJRA has nothing to do with the Sherman Act. The undisputed evidence shows that Quadvest's antitrust claims fail as a matter of law. They are ripe for dismissal on summary judgment.

Quadvest's §1 claim alleges that it is part of an illegal price-fixing cartel. Setting aside that Quadvest is alleging its own guilt as a co-conspirator, this claim makes no sense. The alleged price-fixing agreement does not "fix" prices. And Quadvest has not calculated whether SJRA (or anyone else) has charged supracompetitive prices as part of this "cartel."

Quadvest's §2 claim alleges that SJRA is an attempted monopolist. But Quadvest's antitrust-market and market-share claims are invented from whole cloth. They lack factual, legal, or economic support, and otherwise contradict themselves. These claims fail as a matter of law, and Quadvest's own expert proves this.

Even before reaching the deficiencies of Quadvest's §1 and §2 claims, the Court should dismiss Quadvest's claims for two global reasons: the *Noerr-Pennington* doctrine and the equitable defense of laches. Quadvest's objection to the GRP Contracts is really an objection that Lone Star Groundwater Conservation District's regulations made it necessary to sign the GRP Contract in 2010. Hence, Quadvest's Second Amended Complaint is a literal conspiracy theory that alleges SJRA conspired with Lone Star to issue regulations that would "coerce" Quadvest and others to join SJRA's GRP. Even if Quadvest's conspiracy theory were correct (it isn't), its claims are barred by the *Noerr-*

*Pennington* doctrine, which exempts petitioning the government for regulation—even anticompetitive regulation—from the antitrust laws.

Quadvest's claims should also be dismissed because Quadvest laid behind the log—both affirmatively and by omission—for nine years. After much public discussion, Quadvest signed the GRP Contract with SJRA in 2010. Then, in 2011, Quadvest certified that there was no pending litigation and that the GRP Contracts were valid. In reliance on Quadvest's (and others') certification, SJRA issued more than $500 million in debt to build a surface water treatment plant and water transmission lines, with the challenged contracts as the only source for repayment. SJRA started delivering treated surface water in September 2015. But Quadvest did not file this lawsuit until November 2019, years after $500 million had been spent. What's more, the nine-year delay means that memories faded and relevant witnesses died. It is hard to imagine a case more fitting for the application of the equitable defense of laches. Quadvest's request for equitable relief—rescission of the GRP Contract—should be barred.

At significant expense and after years of discovery, Quadvest cannot identify genuine issues of fact to withstand summary judgment. SJRA therefore respectfully requests that the Court grant this Motion and dismiss Quadvest's claims with prejudice.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Faced with Lone Star's regulation mandating groundwater reduction, Quadvest chose to comply by contracting with SJRA in 2010 and joining its Groundwater Reduction Plan (GRP). Today, Quadvest alleges that its GRP Contract violates the Sherman Act. The

events that led to Lone Star's regulations, Quadvest's GRP Contract, SRJA's issuance of $500 million in debt, and this lawsuit, reveal why Quadvest's claims are without merit.

## A. SJRA and Quadvest.

SJRA is a governmental entity created to regulate "the waters of the San Jacinto River and its tributaries" and to "provide water for domestic, municipal, commercial . . . purposes . . . including water supplies for cities, towns and industries" and "to construct or otherwise acquire water transportation, treatment and distribution facilities and supplemental sources of supply." Ex. 1 at 1–2. It operates groundwater infrastructure for municipal utility districts in The Woodlands, sells raw (untreated) surface water to industrial customers in Harris County, and since 2015, delivers treated surface water to several GRP Participants. Ex. 2 (4/11/23 SJRA 30(b)(6)) Tr. 20:3–12, 49:9–50:6, 60:15–19; Ex. 3 (7/11/23 J. Houston) Tr. 74:20–75:9, 145:10–16.

Quadvest is an investor-owned utility (IOU) that provides water and wastewater services in Montgomery and surrounding counties. Ex. 4 (6/22/23 S. Sequeira) Tr. 92:8–12. Simon Sequeira is its President and CEO. *Id.* at 14:21–23. The Public Utility Commission (PUC) regulates Quadvest's retail water and wastewater services. The PUC issues Certificates of Convenience and Necessity to Quadvest and similar utilities, granting them exclusive right to provide water and/or wastewater services to defined geographic areas. Ex. 4 at 23:8–16, 26:3–13. The PUC must approve Quadvest's rates. *Id.* at 242:22–243:25; Ex. 5 (Quadvest 30(b)(6)) Tr. 203:20–204:11; Ex. 6.

**B.** **Lone Star is created to conserve groundwater in Montgomery County and issues regulations to do just that.**

Lone Star was created by the Texas Legislature and approved by Montgomery County voters in 2001. Ex. 7; Ex. 8 at 3; Ex. 9 at 3. According to one of Lone Star's founding directors, David Kleimann, Lone Star was created to prevent regulatory encroachment by the Harris-Galveston Subsidence District and ensure the county's water was locally regulated. Ex. 10 (D. Kleimann) Tr. 8:9–9:19. And regulate, it did:

- October 2003: Lone Star published a Groundwater Management Plan and decided to limit withdrawals from regulated aquifers to their annual recharge. Ex. 9 at 7; Ex. 10 at 115:18–116:12.

- December 2006: Lone Star adopted Phase I of its District Regulatory Plan (DRP) to reduce groundwater use, stating that "[a]ll past, current, and future users of groundwater in Montgomery County are hereby put on notice that the District will curtail both new and historic use of groundwater as necessary by January 1, 2015." Ex. 11 at 9.

- February 2008: Lone Star adopted Phase II(A) of its DRP, which required "Large Volume Groundwater Users" (LVGUs) to reduce their groundwater pumping by 30% by 2015 (later delayed to 2016) and to submit a "Water Resources Assessment Plan" (WRAP) by March 2009 that included projected water demand through 2045 and "descriptions of new water supply sources and strategies to meet projected water demands." Ex. 12 at 4–8. LVGUs were allowed to submit a joint WRAP with multiple LVGUs. *Id.* at 5. Phase II(B) was adopted on November 10, 2009. Ex. 43.

**C.** **SJRA develops a GRP for LVGUs to comply with Lone Star's DRP.**

Quadvest had multiple options to comply with Lone Star's required 30% reduction in groundwater use. Those options included conservation, Ex. 3 at 32:13–19, converting to water from the unregulated Catahoula aquifer, *id.* at 70:11–19, 94:9–15, 96:3–6, 159:13–20, 161:9–22, reusing water or converting to surface water, or as Quadvest chose, joining a joint GRP to do one or all of the above.

To minimize construction of expensive water transmission lines and keep the cost of compliance down, SJRA's GRP proposed over-converting a few densely populated LVGUs (i.e., reduce their groundwater pumping by more than 30%) so that the other Participants could continue to pump 100% groundwater. Ex. 2 at 85:19–86:19. This would achieve compliance because the group would, collectively, reduce their groundwater use by the required 30%. Ex. 3 at 133:3–16; Ex. 5 at 11:7–12.

From 2008 to 2010, SJRA held dozens of public meetings and presentations discussing its GRP and how it would work if an LVGU chose to join. Ex. 3 at 44:10–21, 42:17–43:25, 47:7–48:2, 101:4–21; Ex. 2 at 99:7–100:2. In April 2008, Quadvest joined SJRA's Joint WRAP. Ex. 13. Lone Star's DRP required SJRA to secure sufficient water to meet demand for its proposed GRP through 2045, so in October 2009, SJRA signed a water supply contract with the City of Houston to do just that. Ex. 12 at 4–6; Ex. 14.

By 2010, there had been numerous public meetings and much discussion of SJRA's proposed GRP to comply with Lone Star's DRP. In March 2010, David Kleimann, an SJRA board member, offered strong public criticism of SJRA's proposed GRP. Quadvest CEO Sequeira received a draft of a letter from Kleimann that was ultimately published in the Conroe Courier, Montgomery County's newspaper of record. Ex. 34; Ex. 35. In the letter, Kleimann criticized: SJRA's "political maneuvering"; SJRA's attempt to "create[] a monopoly without any guidelines, rules, or checks and balances"; SJRA's paying Houston "for two-thirds ownership of the water in Lake Conroe"; and that "SJRA now has control over all the MUD's [sic] in The Woodlands, total control over the water in Lake Conroe and is trying to get control of the water providers in Montgomery County through this

contract. *This is what happens when a state agency is allowed to build a monopoly*." Ex. 34 at 4 (emph. added). The email forwarding this letter to Quadvest stated: "Looks like one of the SJRA board members [Kleimann] has the fortitude to expose what is going on and do the right thing. If we stick together we can beat this thing." *Id.* at 2.

On May 26, 2010, another utility sent Quadvest proposed edits to the GRP Contract. Ex. 15; Ex. 5 at 26:1–6. No edit was to a provision that Quadvest complains about here. *See* Ex. 15 at 2–10. On June 16, 2010, Quadvest described SJRA's GRP to its customers as "the most economical way to reduce groundwater pumpage" and achieve compliance with Lone Star's DRP. Ex. 16 at 2. And on July 1, 2010, Quadvest signed its GRP Contract with SJRA, which it considered "the best economic decision that [it] could [have made] at that time." Ex. 17; Ex. 4 at 125:3–9. Quadvest did not consider other options to comply with Lone Star's DRP. Ex. 4 at 89:2–13; 90:3–10; 132:4–9; Ex. 5 at 35:14–17; Ex. 18.

A year later in May 2011, before SJRA began issuing significant public debt, the Texas Attorney General's office requested that Participants attest that there was no pending litigation and that the GRP Contracts were valid and binding. Ex 19; Ex. 5 at 34:3–25. On May 14, 2011, former-plaintiff Woodland Oaks's president emailed Quadvest's Sequeira and others, writing that "Our IOU group has legal council [sic] and is considering legal action as we feel we have been at the very least 'misled' by Sjra." Ex. 20. Two days later, Sequeira asked his assistant to "organize a meeting for all IOUs on May 25th at noon to present evidence regarding SJRA's false info, the certificate that SJRA is sending out regarding pending lawsuits, and pending litigation." Ex. 21. The same day, Sequeira

corresponded with retained legal counsel to obtain legal advice regarding Quadvest's GRP Contract with SJRA. Dkt. 137.

After all of this, Quadvest signed the "No Litigation" certificate on June 1, 2011, attesting that the "GRP Contract remains in full force and effect and has not been repealed, revoked, modified, amended or rescinded" and that "[n]o litigation of any nature is pending, or to my knowledge, threatened, either in state or federal courts, in respect of the GRP Contract." Ex. 22. Two months later, Quadvest's Sequeira publicly stated that "the best available plan [to comply with Lone Star's DRP] has been to join with SJRA . . . . We receive the best economies of scale this way, otherwise all of the LVGU's [sic] would be on the [sic] own to develop a surface water plant and acquire surface water rights." Ex. 23.

Relying on the signed GRP Contracts and "No Litigation" certificates and the Attorney General's bond approval, SJRA issued between November 2009 and September 2013, more than $500 million in debt to plan and build the infrastructure to treat and deliver surface water for the GRP. Exs. 24–30. In September 2015, SJRA's GRP Division began delivering treated surface water. Ex. 37 at ¶ 5.

### D. Quadvest starts to question Lone Star's DRP and SJRA's GRP.

In 2015—four years after retaining counsel to consider SJRA's GRP Contract before signing the "No Litigation" certificate—Quadvest started to voice doubts about the legitimacy and necessity of Lone Star's DRP and by extension SJRA's GRP. The seeds of these new doubts were planted at least as early as September 2013 by Michael Thornhill, a groundwater engineer—and one of Quadvest's retained experts in this case. Ex. 32. Thornhill emailed Conroe Mayor Webb Melder that "misapplications of science have

caused or will re-enforce three 'water monopolies' in the Gulf Coast Region – the City of Houston, the North Fort Bend Water Authority, *and the San Jacinto River Authority*." *Id.* at 3 (emph. added). Woodland Oak's owner forwarded Thornhill's email to Sequeira, who responded: "Ok. You really have my attention. Now what do we do." *Id.* at 1. What Quadvest "did" was engage in a political and legal fight to invalidate Lone Star's DRP: Quadvest (1) sued Lone Star in August 2015 to challenge its groundwater-reduction rule, Ex. 45; (2) successfully lobbied in 2017 to change Lone Star's board from appointed to elected, *see* Ex. 46; and (3) formed a political action committee to endorse candidates for the new board, Ex. 4 at 196:17–197:19, all of whom won in 2018, *id.* at 209:8–23. These Quadvest-endorsed board members then settled Quadvest's suit against Lone Star, agreeing that Lone Star's groundwater-reduction DRP was invalid. Ex. 94. Nine months later, Quadvest filed this suit.[1]

Along the way and despite its complaints now about a contract it wishes, with hindsight, that it had never signed, Quadvest's business has thrived. Its revenue quadrupled from 2008 to 2020. Ex. 39 at 6; Ex. 5 at 159:16–20 ($5 million to more than $20 million). By 2026, its projected retail revenue will exceed $37 million. Ex. 44; Ex. 5 at 155:6–12. And since 2021 it has expanded its business into what it believed "was an untapped market" for wholesale water. Ex. 5 at 167:3–7. The revenue for that new wholesale business is

---

[1] Quadvest is a member of four other groundwater reduction plans that also impose a pass-through fee like SJRA's pumpage fee, but Quadvest has not challenged those plans. *See* Ex. 33 at 9 (identifying City of Rosenberg GRP; Harris-Galveston Subsidence District GRP; North Fort Bend Water Authority GRP; and the West Harris County Regional Water Authority GRP); Ex. 5 at 50:24–51:23, 54:9–19, 59:11–62:15, 63:10–15, 63:16–20.

projected to grow from about $135,000 to more than $8 million by 2026. Ex. 39 at 35. Quadvest is, by all accounts, doing better than ever. SJRA's GRP has done nothing to stop or inhibit this growth.

## III.    ARGUMENT AND AUTHORITIES

### A.    Standard of review.

The Court should grant summary judgment when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

### B.    Quadvest's claims are barred by the *Noerr-Pennington* doctrine.

Quadvest's antitrust claims are barred as a matter of law because, under the *Noerr-Pennington* doctrine, SJRA is immune from Sherman Act liability for petitioning public officials to take official action. Because Quadvest's claims are premised on SJRA's alleged conspiring with and petitioning Lone Star to issue regulations limiting groundwater production, which SJRA allegedly "used . . . to coerce" Quadvest and others "to join SJRA's GRP by signing the GRP Contracts," SAC ¶70, Quadvest's petitioning-based claims are barred.

The *Noerr-Pennington* doctrine is grounded in the right to petition. *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 379 (1991). Thus, "no violation of the [Sherman] Act can be predicated upon mere attempts to influence the passage or enforcement of laws." *E. R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127,

135 (1961); *see also A Fisherman's Best, Inc. v. Recreational Fishing All.*, 310 F.3d 183, 189 (4th Cir. 2002).

The doctrine applies no matter which branch of government is petitioned. *See Cal. Motor. Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510–11 (1972). It applies even when an anticompetitive result is intended. *Omni*, 499 U.S. at 381; *see Bayou Fleet, Inc. v. Alexander*, 234 F.3d 852, 859 (5th Cir. 2000) (*Noerr-Pennington* applies to any "effort to sway public officials" regardless of intent). Its broad protection shields both the petitioning and any resulting injuries. *Greenwood Utils. Comm'n v. Miss. Power Co.*, 751 F.2d 1484, 1505 (5th Cir. 1985).

After a defendant invokes the doctrine, the plaintiff must show that it does not apply. *McGuire Oil Co. v. Mapco, Inc.*, 958 F.2d 1552, 1558 n.9 (11th Cir. 1992) ("[T]he burden falls on [the plaintiff] to allege facts sufficient to show that *Noerr-Pennington* immunity" does not apply.). Quadvest cannot do so.

Here, it is undisputed that both the GRP and GRP Contract are the result of Lone Star's DRP. Quadvest concedes that complying with Lone Star's DRP is the only reason it needed to sign the GRP Contract and join the GRP. SAC ¶43 & n.49. Quadvest's real complaint is not that the GRP Contract has anticompetitive effects, but that Quadvest had to comply with Lone Star's DRP. SJRA cannot be liable under the Sherman Act for providing "the only realistic option" to comply with Lone Star's DRP. *Id.* Nor does the DRP's later invalidation transform the GRP Contract into a Sherman Act violation after the fact. *Contra Valley Drug Co. v. Geneva Pharms., Inc.*, 344 F.3d 1294, 1306 (11th Cir. 2003) (later invalidated patent did not prove an earlier agreement was anticompetitive).

Any allegedly anticompetitive impacts of SJRA's petitioning are, therefore, the direct result of SJRA's allegedly petitioned-for end: Lone Star's DRP. *See Greenwood*, 751 F.2d at 1505 ("[P]etitioning privileges would indeed be hollow if upon achieving a petitioned-for end the petitioner were then subjected to antitrust liability for his success."). The antitrust laws do not apply to SJRA's alleged efforts to petition Lone Star to regulate groundwater or to the contract required to comply with that regulation. Thus, SJRA is immune from liability for Quadvest's antitrust claims.

### C. Quadvest's claims are barred by laches.

Quadvest only seeks equitable relief in this case: rescission of the GRP Contract, signed in July 2010. SAC ¶80 (citing 15 U.S.C. §26); *id.* at ¶¶79–80, 32 & n.76. That relief is barred by the equitable defense of laches, which applies when a plaintiff unreasonably delays in filing a claim, resulting in prejudice to the defendant. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 121–22 (2002).[2] Although Quadvest's cause of action accrued in July 2010, it waited nine years to file this case. *See Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 598–99 (6th Cir. 2014) (§2 claim accrued when challenged transaction closed). Quadvest's delay justifies dismissal.

The "deadline for suits for equitable relief under the antitrust laws is governed by laches," and the "four-year statute of limitations in 15 U.S.C. §15b furnishes a guideline for computation of the laches period." *Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d

---

[2]  SJRA believes that laches is the appropriate framework to judge Quadvest's unexcused delay in seeking equitable relief. The four-year statute of limitations applies only to claims under 15 U.S.C. §§15, 15a, and 15c, which concern damages claims. Quadvest does not seek damages. If the Court deems the statute of limitations relevant, SJRA alternatively requests dismissal on that ground because Quadvest missed its filing window by more than five years.

1199, 1205 (9th Cir. 2014) (cleaned up); *New York v. Meta Platforms, Inc.*, 66 F.4th 288, 299–300 (D.C. Cir. 2023). Quadvest filed this suit in 2019—nine years after signing the GRP Contract. Quadvest missed its window to sue by more than five years.

Indeed, in cases like this one, where the transactions were publicly announced, laches frequently bars equitable claims brought in *fewer* than four years. *See, e.g.*, *Ginsburg v. InBev NV/SA*, 623 F.3d 1229, 1235 (8th Cir. 2010) (two months was "inexcusable delay[]"); *Taleff v. Sw. Airlines Co.*, 828 F. Supp. 2d 1118, 1123–24 & n.8 (N.D. Cal. 2011) (barring divestiture claim brought *one day* after closing). Laches can also bar claims where the plaintiffs "were on notice of the merger, yet took no significant action prior to its consummation." *Antoine L. Garabet, M.D., Inc. v. Autonomous Techs. Corp.*, 116 F. Supp. 2d 1159, 1172 (C.D. Cal. 2000).

The GRP was widely publicized and discussed in Montgomery County before Quadvest signed its GRP Contract in July 2010. *See, e.g.*, Ex. 3 at 44:10–21, 42:17–43:25; SAC ¶¶24, 26, 29, 37, 43. Over a two-to-three-year period, SJRA coordinated and held town meetings to explain the GRP proposal and invited every LVGU in the county. Ex. 2 at 99:7–100:2. Every Participant (including Quadvest) signed the same form of GRP Contract that had been the subject of extensive, public negotiation. Ex. 3 at 47:7–48:2. Quadvest and others debated the draft contract's terms and expressed concerns about it and whether SJRA was attempting to create a "monopoly." Exs. 34; 35.

Quadvest's nine-year delay creates a rebuttable presumption of prejudice that Quadvest cannot overcome. *Kaiser Aluminum & Chem. Sales, Inc. v. Avondale Shipyards, Inc.*, 677 F.2d 1045, 1057 (5th Cir. 1982) (affirming dismissal of antitrust counterclaim

and noting that, "if the plaintiff's claim is brought outside the analogous limitations period, the bare fact of delay creates a rebuttable presumption of prejudice to the defendant" (cleaned up)). Moreover, Quadvest's lengthy delay has caused both economic and trial prejudice. *See Pro-Football, Inc. v. Harjo*, 415 F.3d 44, 50 (D.C. Cir. 2005). The economic prejudice is obvious. Relying on the signed GRP Contracts and "No Litigation" certificate, SJRA issued more than $500 million in bonds to build the surface water treatment infrastructure, *see* Exs. 24, 25, 27, 28, 29, 30, which are secured solely by revenue from the GRP contracts, Ex. 2 at 24:17–24, Ex. 22.

In terms of trial prejudice, Quadvest's delay has resulted in the loss of important evidence and witnesses. *Pro-Football*, 415 F.3d at 50. Notably, Quadvest's CEO, testified that he could not remember facts from 2010, when the GRP Contract was signed, or even 2015. Ex. 4 at 14:14–20; *id.* at 88:4–12, 89:9–13, ("I don't remember"), 48:2–25, 60:18–22 ("I don't recall. That was, what, 13 years ago."), 62:3–63:4 ("I don't remember the E-mail . . . . This was 13 years ago."). He does not remember signing the "No Litigation" certificate in 2011, and testified he did not "remember what I was thinking at that time." *Id.* at 103:17–24, 126:7–12. Nor does he recall what Quadvest "did in 2008" to investigate alternative methods to comply with Lone Star's DRP. *Id.* at 86:4–13 ("I don't remember doing anything about it in 2008.").

Finally, many witnesses that Quadvest cited in its Complaint and includes in its disclosures have died. Ex. 36 at 4, 5, 7.[3] Quadvest's unreasonable and unexplained delay in filing suit has significantly impacted available evidence and witnesses. Inexcusable delay and prejudice to SJRA justify dismissal based on laches.

**D.    Quadvest has failed to establish an antitrust injury.**

Quadvest has not shown an "antitrust injury"—i.e., an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the [defendant's] acts unlawful." *Jebaco, Inc. v. Harrah's Operating Co.*, 587 F.3d 314, 318, 319 (5th Cir. 2009) (cleaned up). If the alleged injury has nothing to do with whether SJRA's actions were anticompetitive, it is not an *antitrust* injury. *See, e.g.*, *id.* at 320; *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

That is the case here. Quadvest allegedly lost profits from passing SJRA's pumpage fees through to its customers. Quadvest claims that the pumpage fees increased prices, which caused its customers to buy less water, which then caused Quadvest to earn less profit. This purported injury has nothing to do with SJRA's alleged size or exercise of market power, or with whether the GRP Contract is anticompetitive. Had Quadvest not signed the GRP Contract, Quadvest would have paid thousands of dollars in daily fines, Ex. 5 at 11:4–11, or complied with the DRP by either (1) joining a different joint GRP, or (2) reducing or replacing its groundwater production. Each such scenario would likewise

---

[3]    Jim Adams (SJRA GM 1990–2006), Reed Eichelberger (SJRA GM 2006–2012), Alan Potok (engineer who authored allegedly key report), Orval Love (Lone Star board member), and Roy McCoy (Lone Star board member) have all since died. Ex. 37 at ¶¶3–4.

entail a cost, causing customers to buy less water, and decreasing Quadvest's profit. And in each such scenario, "[n]o antitrust violation would have occurred, but [Quadvest] would have suffered the same injury." *Jebaco*, 587 F.3d at 320. Indeed, Quadvest's injury would have been *greater* under any other option—Quadvest admits that SJRA's GRP was its best, most cost-effective option. Ex. 4 at 125:3–9; Ex. 16 at 2; Ex. 23; SAC ¶43 n.49. This fundamental defect justifies dismissing Quadvest's claims.

### E. The Court should dismiss Quadvest's §1 claim.

#### 1. This is not a *per se* case.

*Per se* restraints are only those "that would always or almost always tend to restrict competition and decrease output," have "manifestly anticompetitive effects," "lack any redeeming virtue," and are found "only after courts have considerable experience with the type of restraint at issue" and "can predict with confidence that it would be invalidated in all or almost all instances under the rule of reason." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886–87 (2007) (cleaned up). Horizontal agreements among competitors to fix prices are one example of restraints deemed *per se* unlawful. *Id.* at 886. But as Judge Gilmore explained, the *per se* rule does not apply to Quadvest's §1 claim.

Judge Gilmore held that Quadvest's §1 claim involves "vertical—not horizontal—restraints, which are not *per se* unlawful." Dkt. 72 at 16.

> Here, the groundwater pumpage fees imposed by the GRP Contracts affect the price to purchase raw water, which [Quadvest] then sell[s] to residents in Montgomery County. [Quadvest] do[es] not allege that SJRA and [Quadvest] compete in the same market with the same customer base. Therefore, [Quadvest's] factual allegations do not amount to a horizontal restraint that would be *per se* unlawful.

*Id.* The evidence supports Judge Gilmore's ruling, and there is no fact issue as to whether the GRP Contract is a vertical agreement.[4] They are "vertical" because they are "imposed by agreement between firms at different levels of distribution." *Bus. Elec. Corp. v. Sharp Elec. Corp.*, 485 U.S. 717, 730 (1988). Nor is the GRP Contract "price fixing," which is a naked agreement between competitors "to set a particular price and restrict output of some product or service or otherwise affect the market price." Areeda & Hovenkamp, *Antitrust Law* §2004b. The GRP Contract merely sets a contract price (as many contracts do) for surface water for those who signed the contract. It does not "affect the market price," and it puts no restrictions on what prices Quadvest (or any other GRP Participant) can charge its customers.

Quadvest's §1 claim should therefore be analyzed under the rule of reason.

### 2. The alleged "restraints" are justified under the rule of reason.

To prevail under a rule-of-reason analysis, Quadvest has the burden to prove that the GRP Contract has "an *actual* adverse effect on competition as a whole in the relevant market" by raising prices to supracompetitive levels or lowering quality or output below competitive levels. *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir. 1995).

---

[4]    *Compare, e.g.*, Ex.    2 at    20:13–20    (SJRA's    GRP    involves    contracts    with 80 utility customers to achieve compliance with Lone Star's DRP); Ex. 40, (6/29/23 M. Williams) Tr. 36:15–19 (GRP Contracts concern pumpage fees charged to LVGUs) *with* Ex. 17 at 5 (SJRA provides "wholesale water service"; Quadvest provides "retail water service"); Ex. 4 at 21:3–9 (Quadvest's business involves pumping and delivering groundwater to residential customers), Ex. 5 at 112:22–113:19 (as of 2015, Quadvest's primary competitors were MUDs), *id.* at 161:24–162:9 (SJRA provides groundwater in The Woodlands, but Quadvest has no customers there).

Quadvest challenges three terms of the GRP Contracts under §1: (1) Article VI, which Quadvest says "equalize[s] the wholesale price of raw groundwater with the wholesale price of raw surface water"; (2) §§4.05 and 4.09, which provide SJRA with the option to require GRP Participants to receive treated surface water; and (3) §6.04(i), which "permit[s] SJRA to assess fees against any LVGU who elects to import wholesale raw water from outside Montgomery County." SAC ¶¶57, 59, 60.

As a matter of law, Quadvest cannot carry its burden. *See United States v. Am. Express Co.*, 838 F.3d 179, 194 (2d Cir. 2016). Quadvest offers no evidence that SJRA charged supracompetitive prices—i.e., prices above the competitive level. *See id.* Indeed, Quadvest's economic expert has *no opinion* whether SJRA's pumpage fees are supracompetitive because he did no analysis on what the competitive level is. Ex. 41 (7/14/23 M. Kheyfets) Tr. 14:20–15:7; *id.* at 340:11–14 (stating that whether the pumpage fees are supracompetitive is a "legal determination" for the fact finder). Nor could SJRA set a supracompetitive price or make a supracompetitive profit because the GRP Contracts prohibit it. Ex. 17 at §§6.04(a), (d)) (rates must be "the lowest," and sufficient to cover costs, pay debt, *etc.*—no profit is allowed), 9.03 (requiring GRP division operate "without profit or loss").

Because Quadvest cannot meet its initial burden to show actual anticompetitive effects, SJRA is not required to defend the "restraints" as procompetitive. *See American Express*, 838 F.3d at 195. Nevertheless, the GRP Contract provisions challenged by Quadvest have significant procompetitive attributes related to the goal of providing compliance with Lone Star's DRP. *See McWane, Inc. v. F.T.C.*, 783 F.3d 814, 841 (8th

Cir. 2015). The undisputed evidence, including from Quadvest's CEO, is that SJRA's GRP was "the best economic decision that [Quadvest] could [make] at that time." Ex. 4 at 125:3–9; *see* Ex. 3 at 35:18–12.

The goal of low-cost compliance with Lone Star's DRP could not be met without the provisions Quadvest challenges. The GRP was a joint venture to comply with Lone Star's DRP by constructing a surface-water treatment plant, converting certain Participants to surface water so that others (like Quadvest) could "continue to . . . utilize groundwater," and charging everyone fees to "fund the costs associated with [this project]." Ex. 17 at 2–3.

First, as for the fees imposed by the GRP Contract, they were designed so that all Participants would pay the equivalent cost for compliance with Lone Star's DRP regardless of whether they received surface water. GRP Contract §§6.04(b), (c), (e); Ex. 3 at 166:10–167:16. The equalization of the cost of compliance is critical to prevent free riding. *N. Am. Soccer League, LLC v. U.S. Soccer Fed., Inc.*, 883 F.3d 32, 43 (2d Cir. 2018) ("[e]liminating free riders can be a procompetitive advantage of alleged restraints on competition"). If Participants who continued to pump 100% groundwater (like Quadvest) paid less for compliance than Participants taking surface water, those taking surface water would not join the GRP because they would be subsidizing freeriding groundwater users like Quadvest. With no one to take surface water, there would be no reduction and no compliance. Even with naked price fixing, "joint ventures and other cooperative arrangements are . . . not usually unlawful . . . where the agreement on price is necessary to

market the product at all." *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 23 (1979).

Second, SJRA has never imposed an import fee on Participants who import water from outside the county. Ex. 2 at 138:16–139:2. In any event, the provision is essential to the GRP because groundwater from "adjacent counties" does not count toward the required 30% groundwater reduction. Ex. 12 at 3. So, every gallon imported from outside the county is a gallon that still needs to be offset—by the group—with surface water or another alternative water source to comply with Lone Star's DRP.

Finally, the provision requiring Participants to connect to the project and take surface water is necessary to ensure the GRP could comply with Lone Star's DRP, including any potential future phases. Ex. 2 at 130:9–11, 133:3–8 ("the whole point of the contract is as a group, we've got to come up with a certain amount of conversion"). SJRA had to "achieve compliance . . . . That's our product or service. And so we can't achieve compliance if we tell a participant . . . we need you to take 10 units and they . . . say, nah, I'm going to take 5 this year." *Id.* at 134:2–10.

Quadvest cannot meet its initial burden as a matter of law, and SJRA has valid procompetitive reasons for the alleged restraints. The Court should dismiss the §1 claim.

### F.     The Court should dismiss Quadvest's §2 claim.

For Quadvest's attempted monopolization claim, it must prove, among other things, "a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459–60 (1993). Quadvest cannot do so as a matter of law.

The dangerous-probability element requires showing a significant market share in a properly defined relevant market. *Id.* at 458–59. Quadvest shows neither. It lacks an expert opinion about *any* market share, and it fails to define a relevant antitrust market.

### 1. Quadvest has no competent evidence of market share.

Quadvest's attempted monopolization claim requires proving that the "[d]efendant . . . [has] some legally significant share of the market." *Rockbit Indus. U.S.A., Inc. v. Baker Hughes, Inc.*, 802 F. Supp. 1544, 1553 (S.D. Tex. 1991). No matter what threshold market share is needed to be "legally significant," Quadvest has not met it.

Quadvest's economics expert, Michael Kheyfets, measured market shares by volume and by revenue, but he failed to provide an opinion as to which one constitutes SJRA's relevant market share. Ex. 42, Kheyfets Rep. ¶¶72–73; Ex. 41 at 319:13–16 ("Q. Are you picking one or the other? A. I'm presenting both analyses as illustrating slightly different points, but both are informative as to the point they illustrate."). Indeed, after several attempts to get an answer, counsel (improperly) instructed him not to. Ex. 41 at 325:5–326:5. Given that Quadvest's expert will not say what his opinion is about SJRA's market share, Quadvest has no competent evidence of it. *See Colsa Corp. v. Martin Marietta Servs., Inc.*, 133 F.3d 853, 855 n.4 (11th Cir. 1998) ("Construction of a relevant economic market or a showing of monopoly power in that market cannot be based upon lay opinion testimony.") (cleaned up).

Three additional reasons justify dismissal. First, Quadvest relies on an invented "indirect" market share concept, where SJRA is assigned a market share for water to which pumpage fees are applied. SAC ¶73; Ex. 42 ¶¶72–73. But this is groundwater for which

GRP Participants pay pumpage fees under the GRP Contract, not water that SJRA owns or sells. There is no basis in case law or economics for an "indirect" market share.

Second, Kheyfets fails to analyze the relevant point in time: 2010, when Quadvest signed the GRP Contract. *See United States v. Am. Airlines, Inc.*, 743 F.2d 1114, 1118 (5th Cir. 1984) (The dangerous probability of success should be examined "at the time the acts occur."); *Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 475 (5th Cir. 2000) (same). Kheyfets's measurements don't start until 2011, the year after. That is insufficient as a matter of law.

Third, SJRA's potential market share—both in 2010 and today—is constrained by the terms and conditions of the GRP Contract itself. Those terms and conditions remove the threat of SJRA obtaining a monopoly. *See Colo. Interstate Gas Co. v. Natural Gas Pipeline Co.*, 885 F.2d 683, 694–97 (10th Cir. 1989) (holding that where defendant exercised "all its rights" under a contract to increase its market share by 13%, that contractual limit prevented it from posing a dangerous probability of achieving a monopoly). Here, too, SJRA's potential increase in market share is limited by the GRP Contract, which is tied to Lone Star's mandated reduction.

## 2. Quadvest has not defined a relevant antitrust market.

Quadvest does not properly define a relevant antitrust market because its proposed product and geographic markets lack evidence, are contradicted by the evidence, or are flawed as a matter of law.

First, Quadvest's economics expert analyzes the relevant market using the hypothetical monopolist test from the DOJ/FTC *Horizontal Merger Guidelines*. *See*

*Horizontal Merger Guidelines*, U.S. DOJ & FTC (2010). That test is inappropriate because it applies to a "*profit-maximizing* firm, *not subject to price regulation*." *Id.* (emph. added). However, both Quadvest and SJRA are subject to price regulation and their abilities to earn profits are constrained or eliminated. Quadvest's rates are regulated by the PUC. Ex. 5 at 204:14–15; Ex. 6. And the GRP Contract prohibits SJRA from earning a profit. Ex. 17 §§9.03 (requiring SJRA to operate GRP division "without profit or loss"), 6.04 (conditions on imposing fees and rates); *see* Areeda & Hovenkamp, *Antitrust Law* §807i ("[T]he 'dangerous probability' requirement . . . is designed to identify true attempts by looking at market circumstances objectively and considering whether a *profit-maximizing* firm would have found a particular strategy worthwhile." (emph. added)).

**Product Market.** Quadvest alleges that the product market is "wholesale *raw* water." *E.g.*, SAC ¶¶3, 28, 31, 40, 41, 51, 53 (emph. added). But its economics expert disagrees; he says the relevant product market is "*treated* wholesale water." Ex. 42 ¶46 (emph. added). Without an expert opinion to support its pleaded product market—indeed, with a contradicting opinion—Quadvest has no competent evidence to support it. That alone is enough to dismiss Quadvest's claim.

Quadvest's alleged product market is nevertheless deficient. "A proposed product market must include all 'commodities reasonably interchangeable by consumers for the same purposes.'" *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 417 (5th Cir. 2010) (quoting *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956)). Quadvest alleges that wholesale raw water includes water "delivered to residential and commercial consumers for consumption and/or industrial use." SAC ¶67.

Those uses are not interchangeable. Residential consumers need treated water, which is not interchangeable with raw water for industrial use, because raw water is not safe to drink, and no industrial user would pay extra for treated water only to feed boilers or put out fires. Quadvest also improperly focuses on the alleged product's distribution level—wholesale instead of retail—not the product itself. *PSKS*, 615 F.3d at 417 (rejecting "[w]holesale" market definition because the "definition must focus on the product rather than the distribution level").

**Geographic Market.** Quadvest's alleged geographic market is Montgomery County. SAC ¶68. A geographic market must be "drawn in terms of the presence of substitutes to which consumers will turn in response to price changes," *Hornsby Oil Co. v. Champion Spark Plug Co.*, 714 F.2d 1384, 1393 (5th Cir. 1983), and "must correspond to the commercial realities of the industry and be economically significant," *Apani Sw., Inc. v. Coca-Cola Enters., Inc.*, 300 F.3d 620, 628 (5th Cir. 2002). Quadvest's alleged market is arbitrary and contradicted by the evidence.

Quadvest claims that Lone Star's DRP and SJRA's GRP "recognize the reality that Montgomery County represents the boundaries of a geographic market." SAC ¶68. Not so. Lone Star's DRP applied only to Montgomery County because that is the limit of its jurisdiction. *Id.* ¶23. So, SJRA's GRP—created to comply with Lone Star's DRP—applied only to Montgomery County. They have no independent economic significance.

Defining the market using this political boundary also ignores the undisputed commercial realities of the industry, which show that a county-wide market is far too large. Quadvest's expert admits that "groundwater production and distribution" is "localized."

Ex. 42 ¶19; *see id.* ¶50 n.95.[5] Quadvest serves no customers more than 4.1 miles from one of its wells and calculates that building a 30-mile water transmission line would cost, at the low end, about $156 million ($5.2 million/mile). Ex. 42 ¶51 n.96, ¶57. That is nearly an order of magnitude greater than Quadvest's total net income between 2011 and 2022. *Id.* Quadvest contends the localized nature and prohibitively high transportation costs make importing water from *outside* the county infeasible. If that is true, so too is transporting water *within* the whole of such a large county. There is no basis to claim that high costs prohibit transporting water a few miles across the county border but not from transporting it several dozen miles within the county's borders. Quadvest cannot have it both ways.

Moreover, Quadvest's expert's opinion that Montgomery County is the relevant geographic market is based on circular logic. He concludes that Montgomery County is the relevant geographic market because SJRA's pumpage fees have not been "defeated by . . . customers in the region travelling outside it to purchase the relevant product." Ex. 42 ¶58 (quoting *Horizontal Merger Guidelines* §4.2.2) (omission in original). That begs the question. The only customers paying SJRA's pumpage fees are LVGUs who joined SJRA's GRP. If these LVGUs could have imported water from outside the county for less than the pumpage fees, they would not have joined the GRP in the first place. Nor would

---

[5] "'[T]he source of water is comparatively close to the point of distribution. Individual communities need only to drill one or more wells *within or near their service area* and install groundwater treatment facilities and storage tanks near the well(s) to be able to deliver water.' *This is contrary to the notion of transporting groundwater over long distances*." (quoting Lone Star 2006 Regulatory Study, p. 61) (second emph. added).

doing so have made a difference—groundwater from "adjacent counties" did not count towards Lone Star's groundwater reduction requirement. Ex. 12 at 3.

Quadvest's only other support for its geographic market is Kheyfets's hypothetical monopolist test, also known as the SSNIP test. But his own analysis contradicts the geographic market he defines. This test analyzes a "candidate market," and if the "candidate market passes the SSNIP test," it "can be considered a relevant antitrust market." Ex. 42 ¶61. Kheyfets's candidate market was one of Quadvest's service areas within Montgomery County—Pulte Homes—and it passed the test. *Id.* ¶63. This means that, per Kheyfets's own analysis, there is a relevant antitrust market for the sale of water in (and only in) this candidate region—the Pulte Homes service area. Ex. 40 at 98:8–21; *see also* Ex. 42 ¶31 n.59.[6] This contradicts that the relevant geographic market is all of Montgomery County.

Quadvest's alleged product and geographic markets make no sense, are full of incurable logical holes, and are contradicted by the evidence and Quadvest's own expert. Without a properly defined relevant antitrust market, Quadvest's §2 claim fails.

## IV. CONCLUSION

For the foregoing reasons, SJRA respectfully requests that the Court dismiss Quadvest's §1 and §2 claims with prejudice.

---

[6] "As the [Horizontal] Merger Guidelines also state, 'the hypothetical monopolist test is applied to a group of products together with *a geographic region* to determine a relevant market' . . . ." (quoting *Horizontal Merger Guidelines* §4) (emph. added).

Dated:  September 1, 2023

Respectfully submitted,

_____

James E. Zucker
State Bar No. 24060876
jzucker@yettercoleman.com
Justin S. Rowinsky
State Bar No. 24110303
jrowinsky@yettercoleman.com
Luke A. Schamel
State Bar No. 24106403
lschamel@yettercoleman.com
YETTER COLEMAN LLP
811 Main Street, Suite 4100
Houston, Texas  77002
(713) 632-8000
(713) 632-8002 (Fax)

**ATTORNEYS FOR SAN JACINTO RIVER AUTHORITY**

**CERTIFICATE OF SERVICE**

I certify that on September 1, 2023, a copy of the foregoing was served via email to all parties who have entered an appearance in this lawsuit.

*/s/Justin S. Rowinsky*
Justin S. Rowinsky