IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| QUADVEST, L.P. | § | Case No. 19-CV-4508 |
| | § | |
| *Plaintiff*, | § | |
| | § | Assigned to: |
| v. | § | Judge George C. Hanks, Jr. |
| | § | |
| SAN JACINTO RIVER AUTHORITY, | § | |
| | § | |
| *Defendant*. | § | |
| | § | |

**DEFENDANT'S TRIAL BRIEF ON THE PROPER TIME
TO ASSESS AN AGREEMENT THAT ALLEGEDLY
VIOLATES THE SHERMAN ACT**

Defendant San Jacinto River Authority respectfully submits this trial brief in response to the Court's inquiry regarding the time at which the anticompetitive effects of an agreement, if any, are judged and Plaintiff Quadvest's trial brief addressing the same issue (Dkt. 222).

**A.   Agreements challenged as violations of the Sherman Act are properly judged at the time at which they are entered into.**

Quadvest challenges the "GRP Contract[]" between Quadvest and SJRA as "illegal" under "Sections 1 and 2 of the Sherman Act." SAC ¶ 1. Fifth Circuit precedent, which matches the consensus of courts around the country, is clear: "[I]t is a basic antitrust principle that the impact of an agreement on competition is assessed as of 'the time it was adopted.'" *Impax Lab'ys, Inc. v. Fed. Trade Comm'n*, 994 F.3d 484, 496 (5th Cir. 2021) (quoting *Polk Bros. v. Forest City Enters.*, 776 F.2d 185, 189 (7th Cir. 1985) (Easterbrook, J.); citing FTC & DOJ, *Antitrust Guidelines for Collaborations Among Competitors* § 2.4

(2000)).[1] Quadvest tries to limit *Impax* to its facts, Dkt. 222 at 5, but "a *basic* antitrust principle," 994 F.3d at 496,[2] is necessarily applicable to all antitrust claims.

A simple example from *Polk Brothers* involving a non-compete agreement shows why logic precludes hindsight in judging Sherman Act violations:

> If A hires B as a salesman and passes customer lists to B, then B's reciprocal covenant not to compete with A is "ancillary." At the time A and B strike their bargain, the enterprise (viewed as a whole) expands output and competition by putting B to work. The covenant not to compete means that A may trust B with broader responsibilities, the better to compete against third parties. . . .
>
> A covenant not to compete following employment does not operate any differently from a horizontal market division among competitors—not at the time the covenant has its bite, anyway. *The difference comes at the time people enter beneficial arrangements*. A legal rule that enforces covenants not to compete, even after an employee has launched his own firm, makes it easier for people to cooperate productively in the first place. Knowing that he is not cutting his own throat by doing so, the employer will train the employee, giving him skills, knowledge, and trade secrets that make the firm more productive. Once that employment ends, there is nothing left but restraint—but *the aftermath is the wrong focus*.
>
> A court must ask whether an agreement promoted enterprise and productivity *at the time it was adopted*.

776 F.2d at 189.

---

[1] *Accord, e.g., United States v. Am. Airlines, Inc.*, 743 F.2d 1114, 1118 (5th Cir. 1984); *Taylor Pub. Co. v. Jostens, Inc.*, 216 F.3d 465, 475 (5th Cir. 2000); *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1111 (9th Cir. 2021); *Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d 713, 726 (6th Cir. 2019); *Valley Drug Co. v. Geneva Pharms., Inc.*, 344 F.3d 1294, 1306 (11th Cir. 2003); *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1207-08 (2d Cir. 1981) *In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d 734, 753 (E.D. Pa. 2015), *aff'd*, 868 F.3d 132 (3d Cir. 2017).

[2] Unless otherwise noted, any emphasis to a quote in this brief has been added.

In her *Major League Baseball Properties* concurrence, now-Justice Sotomayor repeated and endorsed the same example. *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 339 (2d Cir. 2008) (Sotomayor, J., concurring). And in a more recent example, the Ninth Circuit rejected a challenge to a non-solicitation agreement, which was "permanent, meaning it outlives the parties' collaboration." *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 9 F.4th 1102, 1109 (9th Cir. 2021) (rejecting argument that restraint was per se unlawful because it "is permanent, meaning it outlives the parties' collaboration"). The court reasoned that, "because the restraint 'promoted enterprise and productivity at the time it was adopted,' the restraint is properly characterized as ancillary, not naked." *Id.* at 1111 (quoting *Polk Bros.*, 776 F.2d at 189).

Quadvest's argument that the antitrust violation here did not occur until 2019, when the Lone Star Groundwater Conservation District's groundwater reduction regulations were invalidated, tracks Judge Easterbrook's example in *Polk Brothers*. Quadvest is in the position of the restrained former employee, complaining that his non-compete agreement now has no value to him and so is only a restraint. Like that former employee, Quadvest ignores that the contract's terms—the groundwater pumpage fees to pay for the surface water treatment and delivery infrastructure that SJRA contractually agreed to build, the equalization of costs to attract surface water recipients, etc.—were part of creating a beneficial, pro-consumer, and procompetitive venture.

Indeed, attempts like Quadvest's to rely on an after-the-fact legal change to prove an antitrust violation have already been rejected by courts. After announcing the "basic antitrust principle that the impact of an agreement on competition is assessed as of 'the

time it was adopted,'" the Fifth Circuit cited favorably to an Eleventh Circuit decision "refusing to consider postagreement invalidation of [a] patent [underlying the agreement] because 'reasonableness of agreements under the antitrust laws are to be judged at the time the agreements are entered into." 994 F.3d at 496 (quoting *Valley Drug Co. v. Geneva Pharms., Inc.*, 344 F.3d 1294, 1306 (11th Cir. 2003)). Fifth Circuit precedent squarely resolves this question.

> **B.     Restraints reasonably necessary for the venture to even exist are not per se violations.**

Quadvest tries to escape the weight of this precedent with circular reasoning. Quadvest argues the Court should ignore the timing question because its GRP Contract is a per se violation. Dkt. 222 at 1-2.[3] But getting the timing right is vital to deciding whether some alleged restraint is a per se violation in the first place.

As Justice Sotomayor explained in *Major League Baseball Properties*, when it comes to collaboration, "where a restraint is reasonably necessary to achieve a joint venture's efficiency-enhancing purposes (i.e., ancillary), it will be analyzed under the rule of reason as part of the joint venture because the effects of that restraint are not so plainly anticompetitive as to make a *per se* or quick-look approach appropriate." 542 F.3d at 339 (emphasis omitted); *accord Texaco Inc. v. Dagher*, 547 U.S. 1, 7 (2006) ("Under the [ancillary restraint] doctrine, courts must determine whether the nonventure restriction is a

---

[3] Quadvest also mentions "other water suppliers" who have entered contracts with SJRA. Dkt. 222. But Quadvest has challenged only its own contract as an antitrust violation. *See* Dkt. 107 at 21 (explaining that the "GRP Contracts . . . are written agreements *between Plaintiffs and SJRA*") (emphasis added). Those other contracts are not at issue and, of course, the counterparties to those contracts are not parties here.

naked restraint on trade, and thus invalid, or one that is ancillary to the legitimate and competitive purposes of the business association, and thus valid."); *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 23 (1979) ("Joint ventures and other cooperative arrangements are also not usually unlawful, at least not as price-fixing schemes, where the agreement on price is necessary to market the product at all."). And if "the restraint 'promoted enterprise and productivity *at the time it was adopted*,' the restraint is properly characterized as ancillary," and thus *not* a per se violation. *Aya Healthcare Servs.*, 9 F.4th at 1111 (quoting *Polk Bros.*, 776 F.2d at 189 (emphasis added)).

  **C. Quadvest's continuing conduct argument is meritless.**

SJRA's continuing enforcement of the GRP Contract does not change the Court's analysis. *Contra* Dkt. 222 at 2-6. Quadvest's argument fails at the outset for at least three independent reasons.

*First*, Quadvest did not plead any theory of continuing violation. Quadvest's claims are that the *contract* violates the Sherman Act:

> **IV.**
> **CAUSES OF ACTION**
>
> A. The GRP Contracts Violate Section 1 of Sherman Act.
>
> B. The GRP and GRP Contracts Violate Section 2 of Sherman Act.

Dkt. 107 at 21, 24. Thus, Quadvest insists, "SJRA violated the Sherman Act *in 2010*." Dkt. 164 at 14. And in its opening argument, Quadvest told the Court it need only look at the terms of the contract.

***Second***, Quadvest's continuing conduct theory is *exactly* what the former employee would be arguing to get out of his non-compete—that is, the very theory foreclosed by the "basic antitrust principle that the impact the impact of an agreement on competition is assessed as of 'the time it was adopted.'" *Impax*, 994 F.3d at 496; *see, e.g.*, *Aya Healthcare Servs.* 9 F.4th at 1109 (rejecting challenge to continued enforcement of non-compete after end of collaboration). If Quadvest's theory were correct, all of the above precedent would have been decided differently.

***Third***, if the contract itself is valid, enforcing it cannot be an antitrust violation, because contract power is distinct from market power. Quadvest must perform under the contract and SJRA may enforce performance "not because of [SJRA's] market power . . . , but because they are bound by contract to do so." *Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 441 (3d Cir. 1997). If SJRA acted unreasonably in enforcing the contract, Quadvest's "remedy, if any, is in contract, not under the antitrust laws." *Id.*; *accord Schlotzsky's, Ltd. v. Sterling Purchasing & Nat. Distribution Co.*, 520 F.3d 393, 407 (5th Cir. 2008) (citing *Queen City Pizza*, explaining that "contract power is distinguishable from market power"). In the Fifth Circuit, "economic power" over contracting parties "derived from contractual agreements . . . has nothing to do with market power, ultimate consumers welfare, or antitrust." *Schlotzsky's*, 520 F.3d at 408 (cleaned up; quoting *United Farmers Agents Ass'n. v. Farmers Ins. Exch.*, 89 F.3d 233, 236–37 (5th Cir. 1996)). Put simply, a party to a contract may not turn to antitrust law to escape its contractual obligations.

None of the authorities Quadvest cites helps its case. Quadvest cites (at 3-4) two Supreme Court decisions: *United States v. E. I. du Pont de Nemours & Co.*, 353 U.S. 586 (1957), and *United States v. ITT Continental Baking Co.*, 420 U.S. 223 (1975). But both decisions turned on the particulars of § 7 of the Clayton Act. *See E. I. du Pont*, 353 U.S. at 596-98; *ITT Continental Baking*, 420 U.S. at 242-43. And, as the Supreme Court described, that law "seeks to prohibit and make unlawful certain trade practices which, as a rule, singly and in themselves, *are not covered by the Act of July 2, 1890 (the Sherman Act)*." *E. I. du Pont*, 353 U.S. at 597 (quotation marks omitted; emphasis added). In other words, those decisions have no relevance here.

Quadvest next turns (at 4-5) to the Ninth Circuit's decision in *In re NCAA Athletic Grant-In-Aid Cap Antitrust Litigation*, 958 F.3d 1239 (9th Cir. 2020). But that decision also has nothing to do with when the effect of an agreement is evaluated under the Sherman Act—it considered only whether a prior decision precluded the plaintiffs' claims either through stare decisis or res judicata. *Id.* at 1253. *NCAA Athletic Grant-In-Aid Cap* (and the Areeda & Hovekamp section the Ninth Circuit and Quadvest cite) stands merely for the proposition that different allegedly anticompetitive aspects of an enterprise may be challenged in different lawsuits—surviving one does not immunize a defendant from others. *See id.* at 1253-54; *see also* Phillip Areeda & Herbert Hovenkamp, Antitrust Law: An Analysis of Antitrust Principles And Their Application ¶ 1205c3 n.40 (4th ed. 2018) (referencing the variety of challenges faced by the NCAA).

Finally, Quadvest raises (at 5-6) the DOJ & FTC *Antitrust Guidelines for Collaboration Among Competitors*. Quadvest is again off-base. Indeed, the Fifth Circuit

relied on those guidelines *as support for* the "basic antitrust principle that the impact of an agreement on competition is assessed as of 'the time it was adopted.'" *Impax*, 994 F.3d at 496.

While the *Guidelines* state that "the competitive effects of a relevant agreement" may be assessed "at formation of the collaboration or at a later time," the reference to "a later time" is accounting for changes in the nature of the collaboration, not whether the parties have soured on the arrangement. Guidelines § 2.4 (referring to "changes in circumstances such as internal reorganization, adoption of new agreements as part of the collaboration, addition or departure of participants, new market conditions, or changes in market share"). Thus, the example the Guidelines offer is a collaboration that grows by adding more and more members until it dominates a market. Guidelines at 29-30. Here, however, there has been no change in the nature of the collaboration—that is Quadvest's very complaint: that "SJRA continues to enforce its GRP Contract." It is *Quadvest* who is trying to change the nature of the collaboration; Quadvest wants to escape its obligation to pay for the infrastructure necessary to the venture and saddle others with that responsibility.

At any rate, the Guidelines make clear that even when the nature of a collaboration changes, any new assessment is "sensitive to the reasonable expectations of participants whose significant sunk cost investments in reliance on the relevant agreement were made before it became anticompetitive." Guidelines § 2.4. That description fits this case to a "T." SJRA performed its obligations to Quadvest, taking on more than $500 million in debt to build infrastructure that allowed Quadvest to satisfy Lone Star's requirements and survive as a going concern. SJRA's reliance interests and sunk costs are dispositive.

The *Guidelines* further undermine Quadvest's price-fixing claim, explaining that when "participants in an efficiency-enhancing integration of economic activity enter into an agreement that is reasonably related to the integration and reasonably necessary to achieve its procompetitive benefits, the Agencies analyze the agreement under the rule of reason, even if it is of a type that might otherwise be considered per se illegal." Guideline 3.1. Even if the GRP Contract somehow fixed prices, both its fees and the equalization of water costs were "reasonably related to the integration and reasonably necessary to achieve its procompetitive benefits." The fee provisions were necessary to build the plant that achieved compliance at all, and the equalization provisions were necessary in order to entice a minority of participants to take surface water, which benefited all other participants by allowing them to comply without reducing their own groundwater use.

## CONCLUSION

The proper time to evaluate whether an agreement is an antitrust violation is at the time the agreement is entered. Here, that is July 1, 2010.

Date: January 24, 2024                                  Respectfully submitted,

                                                        _____
                                                        YETTER COLEMAN LLP
                                                        R. Paul Yetter
                                                        pyetter@yettercoleman.com
                                                        State Bar No. 22154200
                                                        James E. Zucker
                                                        State Bar No. 24060876
                                                        jzucker@yettercoleman.com
                                                        Justin S. Rowinsky
                                                        State Bar No. 24110303
                                                        jrowinsky@yettercoleman.com
                                                        Luke A. Schamel
                                                        State Bar No. 24106403
                                                        lschamel@yettercoleman.com
                                                        Jason LaFond
                                                        State Bar No. 24103136
                                                        jlafond@yettercoleman.com
                                                        811 Main St., Suite 4100
                                                        Houston, Texas 77002
                                                        (713) 632-8000
                                                        (713) 632-8002 (Fax)

### CERTIFICATE OF SERVICE

I certify that on January 24, 2024, a copy of this document was served on all counsel of record using the Court's e-filing system.

                                                        */s/ Justin S. Rowinsky*
                                                        Justin S. Rowinsky