IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| QUADVEST, L.P., § | |
| § | |
| Plaintiff, § | |
| § | |
| VS. § | CIVIL ACTION NO. 4:19-cv-04508 |
| § | |
| SAN JACINTO RIVER AUTHORITY, § | |
| § | |
| Defendant. § | |

**PLAINTIFF'S TRIAL BRIEF ON
ANTITRUST AND COLLABORATING COMPETITORS**

| **MUNCK WILSON MANDALA, LLP** | **KUHN HOBBS PLLC** |
|---|---|
| J. David Rowe | Kurt Kuhn |
| State Bar No. 00794564 | State Bar No. 24002433 |
| Federal ID No. 21394 | Federal ID No. 22915 |
| drowe@munckwilson.com | kurt@kuhnhobbs.com |
| Aaron C. Dilbeck | 7000 North MoPac Expy., Suite 315 |
| State Bar No. 24095723 | Austin, Texas 78731 |
| Federal ID No. 3853694 | (512) 476-6005 |
| adilbeck@munckwilson.com | (512) 476-6002 (Facsimile) |
| 807 Las Cimas Parkway, Suite 300 | |
| Austin, Texas 78746 | |
| (737) 201-1600 | |
| (737) 201-1601 (Facsimile) | |

                                          **ATTORNEYS FOR PLAINTIFF
                                          QUADVEST, L.P.**

At the request of the Court, Plaintiff Quadvest, L.P. files this trial brief to address the Court's questions regarding how antitrust law applies to collaborations among competitors. SJRA has argued the SJRA GRP Contracts should be treated under the law like a joint venture, and that the contracts' anticompetitive provisions should be excused as ancillary restraints used to create the market. But SJRA and Quadvest are not part of any joint venture. Instead, the SJRA GRP Contracts are merely a contract between 80% of the independent competitors in the marketplace that agreed to restrain their conduct, including by price-fixing, market allocation, and tying.

Under *Arizona v. Maricopa County Medical Society*, these types of agreed horizontal constraints among competitors must be struck down as *per se* violations of the Sherman Act, regardless of any purported economic or societal benefit the participants claim to seek to achieve. 457 U.S. 332 (1982). Moreover, even if the Court reviews the SJRA GRP Contracts under quick-look analysis or the rule of reason, the challenged anticompetitive restraints are still impermissible "naked" restraints, objectively intended to restrain competition between participants. As SJRA has admitted at trial, the challenged constraints are designed to eliminate competitive incentives or disincentives between participants who joined the SJRA GRP. The objective effect of the restraints is to raise the price of water in the market and reduce output. The SJRA GRP is not a single entity. It is a group of individual, horizontal competitors who have formed a cartel by contract. This is exactly the type of anticompetitive conduct antitrust laws strictly prohibit.

1

**A.    The SJRA GRP Contracts do not create a joint venture or single entity, but are instead an agreement between independent, horizontal competitors.**

Seeking to obtain more favorable review under the rule of reason, SJRA repeatedly points the Court to cases that involved joint ventures. *See, e.g, Texaco Inc. v. Dagher*, 547 U.S. 1 (2006) (joint venture between two oil companies to sell separately branded gasoline from new entity); *Polk Bros., Inc. v. Forrest City Enters.*, 776 F.2d 185 (7th Cir.) (joint venture between appliance/home furnishing firm and building supplies firm to build a combined store that included covenant not to compete). In fact, in *Texaco*, the specific issue the Supreme Court granted certiorari to decide was whether it was *per se* illegal, under the Sherman Act, "for a lawful, economically integrated joint venture to set the prices at which the joint venture sells its products." 547 U.S. at 3. In that case, under a joint venture agreement, Texaco and Shell Oil agreed to end competition, pool their resources to sell gasoline through a new entity, and share the risks of and profits from their new venture. *Id*. Nothing like that happened here.

In this case, 80 independent water producing competitors who produce approximately 80% of the water supply in Montgomery County agreed to participate in the SJRA GRP Contracts. Substance, not form, determines whether an entity is capable of conspiring under Section 1 of the Sherman Act. *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195 (2010). The relevant inquiry is whether the alleged contract, combination, or conspiracy is a concerted action joining separate decisionmakers. *Id*. If the agreement joins together "independent centers of decisionmaking," then the entities are capable of conspiring under §1, and "the court must decide whether the restraint of trade

2

is an unreasonable and therefore illegal one." As the Fifth Circuit has explained, as a general rule, Section 1 of the Sherman Act does not apply to single entities, but "[o]ther legal entities, however, when made up of members or entities that may compete with each other, may conspire illegally." *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Assoc.*, 776 F.3d 321, 327-28 (5th Cir. 2015).

Cases involving actual joint ventures may fall under the single entities category, but contracts entered into between competitors is subject to the legal restrictions on anticompetitive concerted action. A joint venture can resemble a simple contract among competitors, but it differs in that "[u]nlike the restraining contract, the venture agreement may not directly limit the future behavior of the founders." Phillip Areeda & Herbert Hovenkamp, ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION, ¶ 1478a (4th ed. 2013). This distinction is critical to understanding the standard by which the SJRA GRP Contracts should be reviewed.

Because the SJRA GRP Contracts are an agreement between horizontal, independent competitors, the scheme the participants created is subject to the restrictions of the Sherman Act and *per se* scrutiny. "The mere coordination of decisions on price, output, customers, territories, and the like is not integration, and cost savings without integration are not a basis for avoiding per se condemnation." U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for Collaborations Among Competitors*, § 3.2 (2000). The participants to the SJRA GRP Contracts made multiple agreements as to sharing the costs, the output of water, the market allocations of water, etc. But they remain non-integrated competitors in the Montgomery County water market.

3

In *Arizona v. Maricopa County Medical Society*, the Supreme Court struck down an agreement reached between nonprofit medical foundations as to maximum fees that physicians would charge under a fee-for-service medical service plan as an alternative to existing health insurance plans. 457 U.S. at 339. In doing so, the Court made a clear delineation between a contract between competitors and a single entity. "The foundations are not analogous to partnerships or other joint arrangements in which persons who would otherwise be competitors pool their capital and share the risks of loss as well as the opportunities for profit." *Id*. at 356. Likewise, the participants in the SJRA GRP remained separate entities, do not share any of the ownership of the water treatment plant, and cannot be considered to have acted as a single entity.

SJRA has argued that it would not have built the water treatment plant as it did if everyone did not agree at the time or it knew that it might be challenged as violating the Sherman Act. But a claim that the parties would not have done the deal without cooperation does not matter in determining if the agreement is subject to antitrust restrictions. "The justification for cooperation is not relevant to whether that cooperation is concerted or independent action." *American Needle*, 560 U.S. at 199. "[I]llegal restraints often are in the common interests of the parties to the restraint, at the expense of those who are not parties." *Id*. at 198. Here, it is the consumers of Montgomery County who are stuck paying for the SJRA GRP participants' concerted action in the form of dramatically higher water bills.

The standard that applies to this case turns on whether the 80 participants to the SJRA GRP Contracts are acting as a single entity or as independent competitors via a

contract. This inquiry "is one of competitive reality." *American Needle*, 560 U.S. at 196. An ongoing Section 1 violation cannot evade scrutiny "simply by giving the ongoing violation a name and label." *Id*. at 197. If SJRA could, "[p]erhaps every agreement and combination in restraint of trade could be so labeled." *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 598 (1951). This case does not involve a joint venture or single entity, and as such, the participants to the SJRA GRP Contracts are subject to the restrictions of Section 1 of the Sherman Act.

**B.      The SJRA GRP Contracts were not essential to create a new product, and thus the challenged constraints are subject to the *per se* rule, not the rule of reason.**

Even if the Court views the SJRA GRP Contracts as creating some form of loose joint venture, that still does not change the fact that they are subject to the Sherman Act and the *per se* rule should apply to the constraints created by their contract. Joint ventures have no immunity from antitrust laws. *NCAA v. Board of Regents of Univ. of Okla.*, 468 U.S. 85, 113 (1984). "Indeed, a joint venture with a single management structure is generally a better way to operate a cartel because it will decrease the risks of a party to an illegal agreement from defecting from that agreement." *American Needle*, 560 U.S. at 202. That is exactly what has happened in this case: the SJRA GRP has created a contractual water cartel that controls 80% of the water sold in Montgomery County.

Joint collaboration between competitors can create difficult antitrust problems. "[C]oncentrating too much power in the hands of those controlling a joint venture or other joint integrative activity can create significant competitive hazards, particularly if the participants are actual or potential competitors." William Holmes & Melissa

5

Mangiaracina, Antitrust Law Handbook § 2:22 (Nov. 2023 Update). "In particular, the activity may be misused as a subterfuge to impose illegal competitive restraints of the venturers themselves." *Id*. "Obviously, the most significant competitive threats arise when joint venture participants are actual or potential competitors." Areeda & Hovenkamp ¶ 1478a. The SJRA GRP Contracts fit that descript perfectly.

SJRA argues that the competitive constraints imposed by the SJRA GRP Contracts should be considered justified under rule of reason analysis. It is true that competitors engaged in a joint venture may be permitted to engage in a variety of activities that would be illegal under the *per se* rule when it is necessary to achieve the legitimate purposes of the venture. *Major League Baseball Props., Inc. v. Salvino, Inc*., 542 F.3d 290, 338 (2nd Cir. 2008) (Sotomayor, J., concurring). When applicable, a joint venture can justifiably apply ancillary restraints that are necessary to achieving the purpose of the venture itself. *Id*. SJRA relies on this approach, citing the Supreme Court's *Broadcast Music* opinion and then-Judge Sotomayor's concurrence in *M.L.B Props*., to argue that the challenged anticompetitive restraints included in its SJRA GRP Contracts should be excused as merely ancillary restraints necessary to structure the venture. But that approach does not apply under the facts of this case.

To begin with, the restraints challenged in the SJRA GRP Contracts were not essential for the product at issue to be available. In order for the *per se* rules of illegality to be inapplicable, the restraints on competition must be "essential if the product is going to be available at all." *American Needle*, 560 U.S. at 203; *see also*, *MLB Props.*, 542 F.3d at 339 n.8 (Sotomayor, J., concurring). The Supreme Court has explained that the

6

*Broadcast Music* exception is based on fact that venture created an entirely different product from what the individual participants were able to sell on their own, and necessary in order for the new product to even exist. *Maricopa Cnty. Med. Soc'y*, 457 U.S. at 355-56. That is not the case here.

The evidence in this case by both parties proves that the SJRA GRP Contracts were not necessary, nor did they, create any new product that was not otherwise available. To begin with, there is no dispute that treated groundwater and treated surface water are identical and indistinguishable to the consumer. The use of surface water did not create any new product not otherwise available. However, even if the Court were to presume that treated surface water was a "new" product, SJRA's own representative, Jace Houston, testified that SJRA and others could have produced surface water without creating the GRP Contract. He also agreed that the GRP Group could have been constructed differently, such as a true joint venture in which all of the members owned the water treatment plant. Moreover, Mr. Houston testified that Quadvest was not required to join the SJRA Group and that it could have used alternative sources of surface water for its customers. In fact, the evidence was that the City of Conroe could have built its own water treatment plant, if SJRA had permitted them to do so.

Even if the Court alternatively views the product produced by the SJRA GRP Contracts as "compliance" with the 30% reduction Lone Star Rule, the result is the same. The evidence at trial was that there were multiple avenues that different competitors could have used to achieve compliance. For instance, Houston testified that some producers formed offset agreements with groundwater users in the Catahoula aquifer. SJRA's entire

7

position at trial was that Quadvest did not have to join the SJRA GRP in order to achieve compliance.

Quadvest and other participants sold wholesale water to Montgomery County customers before the SJRA GRP was formed, and they continue to do so today. The SJRA GRP "does not permit them to sell any different product." *Maricopa Cnty. Med. Soc'y*, 457 U.S. at 356. The SJRA GRP Contracts have "merely permitted them to sell their service to certain customer at fixed prices and arguable to affect the prevail market price" of wholesale water in Montgomery County. *Id*. The challenged constraints did not create any new product that could not have been produced without them, and the more lenient review under the *Broadcast Music* exception is not available.

Even if the case law is read broadly, the lesser standards of review are not available to SJRA because there is no joint venture or similar enterprise that SJRA can claim to have created under which the wholesale production of water was only possible if the participants agreed to the challenged anticompetitive constraints. *U.S. v. Apple, Inc.*, 791 F.3d 290, 326 (2nd Cir. 2015). Because the SJRA GRP Contracts were not essential for Lone Star compliance or for wholesale water or surface water to be available in Montgomery County, SJRA's reliance on the ancillary restraints doctrine or joint venture related exception to the *per se* rule is misplaced. *United States v. Aiyer*, 33 F.4th 97, 119 n.19 (2nd Cir. 2022). Otherwise, "the *per se* rule would lose all the benefits of being '*per se*' if conspirators could seek to justify their conduct on the basis of its purported competitive benefits in every case." *Apple, Inc.*, 791 F.3d at 326.

C. **Even if analyzed by applying the doctrine of ancillary restraints, the challenged price-fixing and other constraints are impermissible "naked" constraints.**

Even if the Court adopts the test pushed by SJRA, and subjects the challenged constraints to review under the doctrine of ancillary restraints, they would still need to be struck down as illegal, naked constraints on competition. If a challenged restraint is not necessary to achieve the efficiency-enhancing benefits of the joint venture, and serves as only a naked restraint against competition, it must be struck down. *MLB Props.*, 542 F.3d at 338. Each of the restraints Quadvest challenged are naked restraints and cannot pass review under the Sherman Act.

To apply this test, the Court must distinguish between "naked" and "ancillary" restraints. A particular horizontal agreement is defined as "naked" if it "is formed with the objectively intended purpose or likely effect of increasing price or decreasing marketwide output in the short run, measured by quantity and quality." Areeda & Hovenkamp, at ¶ 1906a. "By contrast, a restraint is ancillary if its objectively intended purpose or likely effect is lower prices or increased output as measured by quantity or quality." *Id*.

Houston testified that SJRA did not intend to violate the Sherman Act and did not believe that it had engaged in price-fixing or other anticompetitive conduct. But that is not the test—nor is it even relevant. A constraint is "naked" based on its "objectively intended purpose" and the defendant's subjective state of mind is not a determining fact: "a restraint might still be naked even though it is well intended." *Id*. at ¶ 1906c. Nor is the question whether the SJRA GRP contracts as a whole are an efficient way to produce wholesale water or comply with the now defunct Lone Star Rule. A restraint is not saved from the

9

"naked" classification simply because it is included in some larger joint venture agreement that is itself efficient. *Id*. ¶ 1908b, at 303. "Members of any cartel could insist that their cooperation is necessary to produce the 'cartel' product and compete with other products." *American Needle*, 560 U.S. at 199 n.7.

Instead, whether a restraint is "naked" turns on what the "reasonably anticipated impact of the particular agreement under scrutiny—measured, of course, against the environment created by the joint venture and its essentiality to that venture." Areeda & Hovenkamp, at ¶ 1908b, at 303-04. Here, the "reasonably anticipated impact" of the challenged constraints was to increase the price of producing wholesale groundwater and decrease marketwide use in the short run. Houston testified that it was understood that the provisions would have the effect of raising the price of water and that would in turn reduce consumption. In fact, the evidence showed that, since the provisions have been in effect, the cost of wholesale water in Montgomery County has dramatically increased while usage is down.

Houston testified that without including the challenged price-fixing and market allocation requirements in the SJRA GRP Contracts no one would have bought surface water. But again, that is not the test or relevant to the analysis under the Sherman Act. In order to prove the provisions were permissible ancillary restraints, the evidence would need to show that they were intended to reduce price and increase output. *NCAA*, 468 U.S. 114. No matter what laudable environmental or policy goals SJRA was trying to achieve, the challenged restraints where clearly naked restraints on competition, with the clear effect of raising the price of water in the market and decreasing consumption.

10

In fact, Houston testified that the entire point of the restraints was to eliminate any incentive or disincentive for participants to continue competing for the right to use surface water or ground water. "[W]hen there is an agreement not to compete in terms of price or output, 'no elaborate industry analysis in required to demonstrate the anticompetitive character of such an agreement.'" *Id.* at 109 (*quoting Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978)). There is no test in antitrust law that allows competitors to collaborate to raise prices in the market while reducing output, but that is exactly what the SJRA GRP Contracts were designed to do and have done in the wholesale market.

**D.      The Sherman Act does not allow individual market participants to form this type of horizontal price-fixing agreements, regardless of any purported benefit.**

In the end, no matter what claimed environmental or future socio-economic benefits SJRA claims are promoted by its SJRA GRP Contracts, they still form a horizontal price-fixing cartel and should not survive antitrust review. Through the SJRA GRP Contracts, SJRA has bound together independent competing wholesale water producers responsible for 80% of the water sold in Montgomery County in a horizontal price-fixing scheme that is exactly the type of conduct the Sherman Act *per se* forbids. *See Apple*, 791 F.3d at 321-29. The effect of the scheme is what was expected; it raised the price of water on consumers and decreased output. These are the harms that the Sherman Act was designed to prevent, and they should be remedied, no matter how reasonable or unreasonable SJRA's purported reasons were for creating the scheme.

The aim and result of every price-fixing scheme is to eliminate some form of competition. *United States v. Trenton Potteries Co.*, 273 U.S. 392, 398 (1927). SJRA has

claimed that the restraints have procompetitive benefits because otherwise no one would agree to buy surface water. But this argument misunderstands the *per se* concept. *Maricopa Cnty. Med. Soc'y*, 457 U.S. at 352. It does not matter what procompetitive benefits that SJRA may claim from binding the parties together in a horizontal price-fixing agreement. "Whatever economic justification particular price-fixing agreements may be thought to have, the law does not permit an inquiry into their reasonableness. They are all banned because of their actual or potential threat to the central nervous system of the economy." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 226, n. 59 (1940).

SJRA's argument is that it and the other SJRA GRP participants should be able to band together using these anticompetitive restraints to achieve purported benefits because the market itself would not do so otherwise. The Supreme Court has rejected that type of claim as "nothing less than a frontal assault on the basic policy of the Sherman Act." *Nat'l Soc. of Prof'l Eng'rs*, 435 U.S. at 695. The Court has rejected the notion that the elimination of so-called competitive evils in an industry is a proper legal justification for this type of price-fixing agreement. *Maricopa Cnty. Med. Soc'y*, 457 U.S. at 350. It is clear that the law "prohibits potentially beneficial as well as blatantly monopolistic restraints on pricing." *St. Bernard Gen. Hosp., Inc. v. Hosp. Serv. Ass'n of New Orleans*, 712 F.2d 978, 986 (5th Cir. 1983).

The policy articulated by the Sherman Act is one of competition, and the Supreme Court has regularly refused similar requests "seeking special dispensation from the Sherman Act on the ground that their restraints of trade serve uniquely important social objectives beyond enhancing competition." *NCAA v. Alston*, 141 S. Ct. 2141, 2159 (2021).

The proper place for SJRA to seek exemption from the antitrust regulations is the legislature, not the courts. *Id.* at 2160. But as the Fifth Circuit has already held, while SJRA may have been given authority to enter into the market, the Texas Legislature did not authorize SJRA to enter into the market in a manner that displaces competition. *Quadvest, L.P. San Jacinto River Auth.*, 7 F.4th 337, 348 (5th Cir. 2021). Without such legislative authority, the challenged constraints in the SJRA GRP Contracts cannot survive review under the Sherman Act.

Respectfully Submitted,

**MUNCK WILSON MANDALA, LLP**
807 Las Cimas Parkway, Suite 300
Austin, TX 78746
(737) 201-1600

By: /s/ J. David Rowe
J. David Rowe
State Bar No. 00794564
Federal ID No. 21394
drowe@munckwilson.com
Aaron C. Dilbeck
State Bar No. 24095723
Federal ID No. 3853694
adilbeck@munckwilson.com

Kurt Kuhn
State Bar No. 24002433
Federal ID No. 22915
kurt@kuhnhobbs.com
**KUHN HOBBS PLLC**
7000 North MoPac Expy., Suite 315
Austin, Texas 78731
(512) 476-6005

***ATTORNEYS FOR PLAINTIFF***

14

**CERTIFICATE OF SERVICE**

 I hereby certify that a true and correct copy of the foregoing is being served on the following counsel of record by the Court's electronic filing system on this 26st day of January, 2024:

R. Paul Yetter
pyetter@yettercoleman.com
James E. Zucker
jzucker@yettercoleman.com
Justin Rowinsky
jrowinsky@yettercoleman.com
Luke A. Schamel
lschamel@yettercoleman.com
Jason LaFond
jlafond@yettercoleman.com
**YETTER COLEMAN LLP**
811 Main St., Suite 4100
Houston, Texas 77002

              */s/ J. David Rowe*
              J. David Rowe

15